JUDGE FURMAN

13 CV 3074

ANDREW M. CALAMARI
REGIONAL DIRECTOR
Michael J. Osnato, Jr.
Wendy B. Tepperman
Howard A. Fischer
Amanda L. Straub
Attorneys for Plaintiff

SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281-1022
(212) 336-0589 (Fischer)



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,      :
:
Plaintiff,      :
:
v.      :
:
TOMAS ALBERTO CLARKE BETHANCOURT,      :
JOSE ALEJANDRO HURTADO, HAYDEE LETICIA :
PABON, and IURI RODOLFO BETHANCOURT,      :
:
Defendants.      :
:
:

---

13 CV      (      )

ECF CASE

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Tomas Alberto Clarke Bethancourt ("Clarke"), Jose Alejandro Hurtado ("Hurtado"),

Haydee Leticia Pabon ("Pabon"), and Iuri Rodolfo Bethancourt ("Bethancourt") (collectively,

"Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This action arises from a massive fraudulent scheme involving tens of millions of dollars of illicit kickbacks and other "pay to play" arrangements among individuals affiliated with a New York broker-dealer, Direct Access Partners, LLC ("DAP"), and at least one corrupt senior official of a Venezuelan state-created and owned banking entity, Banco de Desarrollo Económico y Social de Venezuela ("BANDES").

2.      Beginning in October 2008 and continuing through at least June 2010, Defendant Clarke was a key principal of DAP's Global Markets Group ("DAP Global") along with two other individuals, Executive-1 and Executive-2 (collectively, the "DAP Global Principals"). DAP Global primarily executed fixed income trades for customers in foreign sovereign debt. BANDES was a new customer to DAP brought in by DAP Global's Principals through their connections to Defendant Hurtado.

3.      Between January 2009 and June 2010, DAP Global generated more than $66 million in revenue for DAP from transaction fees — in the form of markups and markdowns — on riskless principal trade executions in Venezuelan sovereign or state-sponsored bonds for BANDES. This revenue was the result of a multifaceted kickback scheme orchestrated by the Defendants in which a portion of this revenue was illicitly paid to BANDES Vice President of Finance, María (Mary) de los Ángeles González de Hernandez ("Gonzalez"), who authorized the fraudulent trades, and to Defendants Hurtado, Pabon, and Bethancourt for their roles in the scheme. After these payouts and other expenses, the three DAP Global Principals — Defendant Clarke, Executive-1, and Executive-2 — shared 60 percent of DAP Global's net profits.

4.      As a result of the Defendants' kickbacks to Gonzalez, DAP obtained BANDES'

lucrative trading business and provided Gonzalez with the incentive to enter into trades with

DAP at considerable markups or markdowns and without regard to the prices paid by BANDES.

5.      Notwithstanding the kickbacks paid, Defendants Clarke and Hurtado, directly and

indirectly, falsified the size of DAP's markups to BANDES and/or Gonzalez, which enabled

them to retain a greater share of the fraudulent profits.

## SECURITIES LAWS VIOLATIONS

6.      By virtue of the foregoing conduct and as alleged further herein, Defendants

Clarke, Hurtado, Pabon, and Bethancourt, singly or in concert, directly or indirectly, have

engaged in acts, practices, schemes, transactions, and courses of business that violated Sections

17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1)

and 77q(a)(3)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. § 78j(b)], and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and

240.10b-5(c)].

7.      Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], each of the

Defendants is liable for aiding and abetting: (i) the other Defendants' and/or DAP's violations of

Sections 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and 10b-5(c)

thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)]; and (ii) DAP's violations of Section

15(c)(1)(A) [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3].

8.      Defendants Clarke and Hurtado, pursuant to Section 20(e) of the Exchange Act

[15 U.S.C. § 78t(e)], are also liable for aiding and abetting DAP's violation of Exchange Act

Rule 15b7-1 [17 C.F.R. § 240.15b7-1].

9.     Unless permanently restrained and enjoined, each Defendant will again engage in the acts, practices, schemes, transactions, and courses of business set forth in this Complaint, and in acts, practices, schemes, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

10.    The Commission brings this action pursuant to the authority conferred by Section 20 of the Securities Act [15 U.S.C. § 77t] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] seeking, among other things, to restrain and enjoin permanently the Defendants from engaging in the acts, practices, schemes, transactions, and courses of business alleged herein.  In addition to injunctive relief, the Commission seeks: (a) final judgments ordering the Defendants to disgorge their ill-gotten gains, with prejudgment interest; (b) final judgments ordering the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)]; and (c) such equitable and other relief as the Court deems just, appropriate or necessary for the benefit of investors [15 U.S.C. § 78u(d)(5)].

11.    This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  The Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of interstate commerce, of the mails, the facilities of national securities exchanges, and/or the means or instruments of transportation or communication in interstate commerce in connection with the acts, practices, and courses of business alleged herein.

12.    Venue in the Southern District of New York is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]

because certain of the acts, practices, transactions, and courses of business alleged herein occurred in this district, including, but not limited to, at DAP's New York office.

**DEFENDANTS**

13.     **Defendant Clarke**, 43, also known as "Tomas Clarke," is a U.S. citizen and resident of Miami, Florida. Clarke was hired by DAP in October 2008, together with Executive-1, Executive-2, and other individuals who previously worked at another broker-dealer registered with the Commission. Clarke serves at DAP as an Executive Vice President in fixed income within DAP Global and works out of DAP's Miami branch office. Clarke holds a General Securities Representative registration. Defendants Clarke and Bethancourt are apparent relatives; Clarke's mother's maiden name is "Bethancourt."

14.     **Defendant Bethancourt**, 40, resides in Panama. Bethancourt purports to be the President of ETC Investment, S.A. ("ETC"), a Panama corporation formed in 2004. Defendant Clarke holds a power of attorney for ETC. Bethancourt has worked as a bank teller and operations officer at various banks in Panama. DAP made payments of more than $20 million to ETC and Bethancourt in connection with the fraudulent scheme described herein. ETC is an apparent acronym for Edgar Tomas Clarke, Clarke's father.

15.     **Defendant Hurtado**, 38, also known as "Alejandro" or "Alejo," is a U.S. citizen and resident of Miami, Florida. Hurtado was born in Colombia and became a U.S. citizen in or before September 2008. Hurtado was hired by DAP as a purported non-registered "back office" employee as of July 1, 2009. DAP made payments of more than $6 million to Hurtado in connection with the fraudulent scheme described herein. Hurtado is married to Defendant Pabon.

5

16.     **Defendant Pabon**, 33, is a resident of Miami, Florida.  Pabon was born in
Venezuela, but has resided in Florida since 2000.  Pabon is the Director for International Sales in
Eastern Europe, the Middle East, and Russia for a Miami-based distributor of a Venezuelan cable
television network programs.  DAP made payments of more than $8 million to Pabon in
connection with the fraudulent scheme described herein.

## OTHER RELEVANT PERSONS

17.     **DAP** is a New York limited liability corporation formed in 2002 with its principal
place of business in New York, New York.  DAP is a broker-dealer registered with the
Commission and is a member of the Financial Industry Regulatory Authority ("FINRA"), New
York Stock Exchange ("NYSE"), American Stock Exchange, and NASDAQ.  DAP is owned by
Direct Access Group LLC ("DAG").

18.     **BANDÉS** is a Venezuelan state-owned banking entity that acts as the financial
agent of the state to finance economic development projects.

19.     **Gonzalez**, 58, is a Venezuelan citizen and a senior officer of BANDES serving as
the "Vicepresidencia de Finanzas" (Vice President of Finance) or "Gerente Ejecutiva de
Finanzas y Administración de Fondos" (Executive Manager of Finance and Funds
Administration).  She is an authorized person on the BANDES account(s) at DAP and the
primary point of contact for DAP.

## FACTUAL ALLEGATIONS

### A.     Overview

20.     DAP was founded in 2002 as a brokerage firm on the floor of the NYSE and the
American Stock Exchange.  Prior to October 2008, DAP primarily provided equity execution

services on an agency or riskless principal basis to institutional customers.

21.     In 2007 and 2008, DAP reported revenues of approximately $15 million and $27 million, respectively, almost exclusively from unsolicited equity transaction commissions. DAP's revenues soared in 2009 to $75 million (five times what it had been only two years before) and were $31 million in the first half of 2010, with the increase almost exclusively due to the fraudulent scheme described herein.

22.     In October 2008, Defendant Clarke, along with Executive-1 and Executive-2, initiated DAP Global's business of providing customers with fixed income trade execution services. With respect to bond trades, DAP Global generated revenue by marking up bond purchases and marking down bond sales in "riskless principal" transactions. A riskless principal transaction is the economic equivalent of an agency trade. Like an agent, a firm engaging in such trades has no market function, buys only to fill orders already in hand, and immediately books the securities it buys to its customers. Essentially, the firm serves as an intermediary for others who have assumed the market risk on any particular transaction. In such transactions, if a customer wishes to purchase a bond, a broker-dealer locates the bond, purchases it on the open market, and then resells it to its customer at a markup. The reverse is true when a customer sells a bond (and the broker-dealer earns a markdown). Clarke was primarily responsible for overseeing the execution of the trades and tracking the markups/markdowns on those trades.

23.     DAP agreed to pay the three DAP Global Principals 60 percent of the net profits generated by DAP Global. Net profits were defined as revenues generated by DAP Global from markups/markdowns and equity commissions revenues minus DAP Global's clearing, business, and other expenses (including payments to Defendants Bethancourt, Hurtado, and Pabon). Of

7

the 60 percent revenue allocation to the DAP Global Principals, Clarke received 20 percent, Executive-1 received 67.5 percent, and Executive-2 received 12.5 percent.

24.    Between January 2009 and June 2010, DAP Global generated revenues of approximately $74 million on unsolicited trades executed on an agency or riskless principal basis. This figure constituted more than 70 percent of DAP's total revenues (totaling approximately $106 million) for that period. From DAP Global net profits of approximately $32 million, the DAP Global Principals were entitled to approximately $19 million pursuant to their 60 percent agreement (of which Clarke's 20 percent share was approximately $3.8 million).

25.    Of the approximately $74 million in total DAP Global revenue generated between January 2009 and June 2010, more than $66 million — in excess of 90 percent — was from markups/markdowns charged on riskless principal trades executed by DAP in Venezuelan sovereign or state-sponsored bonds for BANDES. Accordingly, on a proportional basis, the three DAP Global Principals collectively earned for themselves more than $17 million (90 percent of $19 million) from markups/markdowns on trade executions for BANDES, with Clarke's share being more than $3.4 million. In executing some of these trades for BANDES, Clarke participated in intentionally deceiving DAP's clearing brokers, executing internal wash transactions, inter-positioning another broker-dealer, and engineering at least two large same day roundtrip trades, as described in more detail below.

26.    At all relevant times, Gonzalez was BANDES' Vice President of Finance and an authorized person for the BANDES account(s) with DAP. BANDES, as well as a number of other Venezuelan-related customers/counterparties, were brought to DAP by the DAP Global Principals through their connection to Hurtado. The ability of the DAP Global Principals to

8

generate more than $66 million in markups/markdowns for DAP Global — and to collectively earn themselves personally at least $17 million — was tied to a multifaceted kickback scheme in which a portion of DAP's markups were improperly directed to Gonzalez and Hurtado.

27.     As an individual who both authorized the trades on behalf of BANDES and personally received kickbacks based on DAP's markups in executing those trades, Gonzalez had the incentive to enter into trades on behalf of BANDES without regard to the prices paid by BANDES. Gonzalez received and/or expected to receive at least $9 million for BANDES trades from 2009 through June 2010.

28.     In order to facilitate this fraudulent arrangement, the Defendants participated in arranging for DAP to pay as expenses approximately half of the revenue generated from markups/markdowns on BANDES trades disguised as various forms of sham compensation to Hurtado (either directly or through his then-fiancée, Pabon) and to Bethancourt (over which Clarke exercised control), with the understanding that a portion of those payments would then be remitted to Gonzalez.

29.     Hurtado was compensated for this scheme: (i) initially, for BANDES trades through July 2009, by DAP's payments of approximately $8.6 million in purported foreign finder ("FF") fees to Hurtado's then-fiancée, Pabon, and (ii) subsequently, beginning for BANDES trades in August 2009, by DAP's payments of approximately $6.1 million directly to Hurtado as salary and bonus in his purported capacity as a newly hired non-registered "back office" DAP employee. Hurtado in turn directed a portion of these amounts to Gonzalez.

30.     In addition to Clarke's compensation from DAP, Clarke also shared in the compensation that was paid to Bethancourt in the scheme. As such, Bethancourt acted as a

9

"front" for Clarke to collect additional compensation in connection with this scheme. Bethancourt, and by extension Clarke, received compensation: (i) initially in 2009, by DAP's payment of purported FF fees to ETC, and (ii) beginning in 2010, by DAP's payments directly to Bethancourt of purported foreign associate ("FA") fees. Nearly all of DAP's payments to ETC and Bethancourt – totaling more than $20 million – were deposited to ETC accounts over which Clarke exercised control. Clarke directed a portion of these amounts from accounts of ETC to Gonzalez.

31.     The kickback scheme generally worked as follows. <u>First</u>, when BANDES wanted to purchase Venezuelan bonds through DAP, Clarke gathered information on market bid-ask spreads for the bonds and requested "offer" prices from one or more third-party dealers. Clarke then provided to BANDES, either directly by phone or indirectly through Hurtado, a price on the bonds to BANDES that would include a significant markup for DAP. <u>Second</u>, the DAP Global Team arranged for DAP to pay approximately half this markup revenue to facilitate improper kickbacks to Gonzalez, Hurtado, and/or others. <u>Third</u>, a portion of the payments DAP made to Pabon, Hurtado, Bethancourt, and ETC were remitted to Gonzalez. The following illustrates the basic flow of funds:

32.



33.     However, notwithstanding the kickbacks paid to Gonzalez, as part of their

scheme, Clarke and Hurtado also directly and indirectly deceived and provided false information to Gonzalez as to the amount of DAP's markups/markdowns in order to retain a larger share of the profits for themselves.

34.     As described in greater detail herein, the Defendants' misconduct in perpetrating their fraudulent scheme involved numerous fraudulent and deceptive aspects, including:

- Collusion with, and the improper payment of, millions of dollars in kickback payments to the agent (Gonzalez) of the customer (BANDES) to generate inflated markups;

- Misrepresentations to the agent (Gonzalez) of the customer (BANDES) about the markups DAP earned on BANDES trades;

- Payment of millions of dollars of transaction-based compensation to a non-registered employee (Hurtado) in violation of FINRA and Commission regulations;

- Payment of millions of dollars in purported FF/FA fees (to Pabon and Bethancourt/ETC) on accounts that those purported FF/FAs did not introduce in circumvention of FINRA and Commission regulations;

- Payment of millions of dollars FF fees to an individual (Pabon) who was ineligible under FINRA rules to qualify as a FF; and

- Practices to generate markups that involved intentionally misleading DAP's clearing brokers, executing "internal" wash trades, inter-positioning another broker-dealer, and at least two large roundtrip trades resulting in BANDES paying more than $10.5 million in markups.

## B.   DAP's Sham Payments to Hurtado, Pabon, and Bethancourt

35.     DAP's ability generate the more than $66 million in markups depended on the continued payment of kickbacks by DAP to Gonzalez and Hurtado.  In order to make the payments necessary for the scheme to Gonzalez and Hurtado, the Defendants participated in laundering the improper payments through purported FF/FA fees paid to Pabon, Bethancourt, and ETC, and through purported "back office" non-registered employee compensation to Hurtado.

36.     FINRA's National Association of Securities Dealers ("NASD") and NYSE rules generally restrict FINRA and NYSE member firms, such as DAP, from paying transaction-based finders' fees, such as a percentage of markups, to non-registered persons, with limited exemptions that include those for FFs (NASD Rule 1060 and FINRA Incorporated NYSE Rule Interpretation 345(a)(i)/03) and FAs (NASD Rule 1100).

37.     NASD Rule 1060(b) and NYSE Rule Interpretation 345(a)(i)/03 permit transaction-based compensation to be paid to a non-registered foreign person or entity as a FF based on the business of a customer they direct to a broker-dealer only if certain conditions are met, including that the finder is a foreign national or foreign entity domiciled abroad and conducts all activities outside of the United States. The FF's activities in the business of the broker-dealer must be limited to the initial referral of non-United States customers to the firm and the FF may not be an associated person of the firm. NASD Rule 1100 permits broker-dealers to employ, register, and pay transaction-based compensation to individuals as FAs only under certain conditions, including that the individual is not a U.S. citizen or resident, conducts all securities activities outside of the United States, and registers with FINRA (but is exempt from passing examination requirements).

38.     For individuals conducting any business in the United States, NASD Rules also generally require all member firm personnel who are to function as "representatives" to register with FINRA in an appropriate category of registration, which requires passing one or more examinations. The NASD has generally interpreted "representatives" to include employees who share in the commissions generated from customer accounts.

39.     In order to circumvent regulations and conceal the payment of kickbacks to Gonzalez necessary for the operation of their scheme, the Defendants participated in arranging

for DAP to improperly pay, directly or indirectly, a total of at least $36.8 million from markups/markdowns charged on BANDES trades to Hurtado, Pabon, ETC, Bethancourt and/or other sources, at least $9.1 million of which was to be remitted to Gonzalez.

### 1.   Sham Arrangements with Hurtado and Pabon

40.     As a U.S. resident since 2000 and a U.S. citizen since at least September 2008, Hurtado was not eligible to receive transaction-based compensation under FINRA's exemptions for FFs or FAs and did not qualify for any other exemption to receive finders' fees for the BANDES account. Hurtado had also not passed the applicable examination(s) required by FINRA in order to be eligible to become a registered "representative" of DAP and thereby be eligible to receive transaction-based compensation.

41.     However, Hurtado was DAP's primary link to Gonzalez and BANDES, and the payouts to Hurtado were necessary for the operation of the scheme. In addition, Hurtado acted as the primary point of contact between BANDES and DAP Global personnel, and arranged for BANDES' purchases and sales of bonds. For example, on August 26, 2009, a BANDES employee emailed only Hurtado, copying Gonzalez, with a list of bonds to sell in an attached spreadsheet. Hurtado forwarded the email to Clarke. The following day, Clarke directed DAP's purchase of the bonds from BANDES at a markdown and sale to the street at prices generating a profit of approximately $569,822 for DAP (of which Hurtado was to receive a payout of approximately $168,286.60 and Gonzalez was to receive a kickback of $61,555.90, as reflected in a spreadsheet created and/or used by Clarke and Hurtado). Hurtado also "introduced" DAP Global to a few other smaller Venezuelan-related accounts (the "Other VZ accounts") prior to BANDES becoming a customer of DAP, and received compensation for trades in those accounts.

42.     To circumvent regulations generally prohibiting payment of transaction-based

compensation to non-registered U.S.-based "finders" and to conceal their scheme, Clarke and

Hurtado participated in orchestrating a series of sham arrangements to conceal Hurtado's

improper receipt of payouts with respect to BANDES and the Other VZ accounts.

43.     First, prior to BANDES becoming a DAP customer, Clarke and Hurtado

participated in arranging for DAP to conceal payments to Hurtado on trades for the Other VZ

accounts by entering into a purported FF agreement, dated as of November 2008, with Private

Wealth Corporation S.A. ("PWC"). Hurtado was a co-owner of PWC and operated out of

Florida, but PWC purported to be based in Geneva. The agreement provided that DAP would

pay PWC a certain percentage of DAP's markups/markdowns and equity commissions charged

on accounts introduced by PWC. However, payments to PWC were merely a conduit for

Hurtado to improperly receive payment on trades for the Other VZ accounts. As a result of this

arrangement, DAP improperly paid PWC approximately $250,000 as purported FF fees for

trades in November and December 2008 on the Other VZ accounts.

44.     Clarke and Hurtado, together with Pabon (Hurtado's soon-to-be wife),

orchestrated a new iteration of the arrangement for trades beginning in January 2009, in which

Hurtado's payouts were paid to Pabon as a purported FF. Notwithstanding the fact that Pabon

had been a U.S. resident since 2000 and therefore was ineligible under the applicable regulations

to act as a FF, DAP executed a purported FF agreement with Pabon entitled "International

Foreign Finder Commission Share Agreement" dated as of January 2009. The agreement, signed

by Pabon and Executive-1 on behalf of DAP, provides that Pabon "is willing to give [her] clients

access to the US stock market by opening accounts [for certain customers] at DAP in the name

of such customer[s] for the purpose of having DAP provide execution services out directly for

14

[those] customers" and that DAP would pay Pabon a portion of DAP's profits on referred accounts based upon an agreed upon commission schedule. The agreement misrepresents Pabon as a foreign national domiciled abroad and, in furtherance of the ruse, Pabon provided a copy of her Venezuelan passport and identification card to DAP through Hurtado.

45.    Purportedly pursuant to this FF agreement, Clarke participated in arranging for DAP to pay Pabon approximately $9.3 million in FF fees relating to trade executions from January through July 2009, with approximately $8.6 million relating to BANDES trades and the remainder relating to trades by the same Other VZ accounts for which PWC previously received FF fees. The payments to Pabon constituted approximately 25 to 30 percent of DAP Global's revenue generated from these trades. Approximately $1.7 million of the amounts received by Pabon from DAP were designated to be remitted to Gonzalez. Clarke and Hurtado documented the scheme in spreadsheets that detailed payouts on trades for which Pabon was to receive compensation that also included an allocation of the amount due to Gonzalez.

46.    Payment to Pabon, however, was another sham arrangement contrived by the DAP Global Team, Hurtado, and Pabon. Pabon had no legitimate role in introducing BANDES or the Other VZ accounts to the DAP Global Team — or even a background in such a business — facts these Defendants took steps to conceal.

47.    For example, when DAP received an inquiry from the compliance department of one of DAP's clearing brokers concerning its use of FFs in or around August 2009, DAP Global personnel requested that Pabon provide a description of her background. In response to this request, Pabon sent an email describing her background, stating that she "moved to the United States in 2000 with the purpose of ... finishing her college studies" and is "a young executive...

involved in [s]ales, [p]ublic relations and marketing industries" as the Director for International

Sales in Eastern Europe, the Middle East, and Russia for a Venezuelan television channel.

48.     After receiving a forwarded copy of the email about Pabon's background,

Executive-2 wrote to Executive-1 on August 23, 2009:

> We will have to fix this up a bit.... I would definitely take out the Eastern Europe,
> Middle East and Russia part – but we could talk up the contacts she got through
> this job.  Can they elaborate on this an [sic] make her sound not so young – too
> much school stuff.  Like include a line that she has extensive contacts in media in
> the Us [sic] and Latin America and *that is where she might have met the people
> she introduced us to*.  (emphasis added)

49.     Moreover, virtually all communications at DAP about Pabon and the accounts she

purportedly introduced were with Hurtado, including transmission of the Pabon FF agreement,

Pabon's wire transfer information for payments, spreadsheets of Pabon's FF payouts with the

amount of the kickback to be paid to Gonzalez, and communications about the accounts or with

the account holders.

50.     Shortly after receiving the inquiry from DAP's clearing broker, Clarke and

Hurtado participated in orchestrating a new iteration of their fraudulent arrangement for trades

beginning as of August 2009.  Instead of making the payments through Pabon as a purported FF,

these Defendants participated in arranging for DAP to conceal its payouts to Hurtado on these

trades by hiring Hurtado as a purported DAP "back office" non-registered employee at an annual

salary of $1.2 million and for Hurtado to receive a "bonus" that was actually calibrated to make

up the difference between Hurtado's salary and the payouts owed to him on BANDES trades that

were formerly paid as FF fees to Pabon.  However, as a purportedly ministerial non-registered

employee of DAP, Hurtado was not eligible under the applicable rules and regulations to receive

this transaction-based compensation.

51.    For example, for the remainder of 2009, Clarke and Hurtado participated in

tracking and accruing Hurtado's compensation on BANDES trades, and then arranged for DAP

to pay the total of those accrued amounts, minus the salary that Hurtado had received in 2009, as

a purported bonus in February 2010.  In total, pursuant to this arrangement, DAP paid Hurtado

approximately $6.1 million for trades from August 2009 through June 2010, nearly all of which

related to BANDES trades.  These payments to Hurtado constituted approximately 20 percent of

the DAP Global's revenues that were generated by BANDES trades in markups/markdowns

during this period.

52.    At the same time, Clarke and Hurtado participated in modifying their arrangement

so that for trades beginning August 2009, the kickbacks paid to Gonzalez were to be remitted to

her by ETC and Bethancourt as described herein.  As a result, unlike with respect to the payouts

to Pabon, there was no corresponding portion of the amounts DAP paid to Hurtado that was

designated to be remitted to Gonzalez for trades beginning August 2009, although Hurtado

continued his involvement in monitoring the compensation due to Gonzalez.

### 2.    Sham Arrangements with Bethancourt

53.    To further facilitate making kickback payments to Gonzalez and to receive

additional compensation for himself and an apparent relative, Clarke arranged for DAP to enter

into a FF agreement, dated as of May 2009, with ETC, a Panama corporation purportedly owned

by Bethancourt, and subsequently in early 2010 cancelled that agreement and executed a FA

agreement with Bethancourt and registered Bethancourt as a FA of the firm.  The May 2009

agreement, entitled "International Foreign Finder Commission Share Agreement," was signed by

Bethancourt in his capacity as ETC's President and by Executive-1 on behalf of DAP.

54.     The basic terms of the agreement were essentially identical to DAP's FF

agreement with Pabon. The 2010 FA agreement, signed by Bethancourt and by DAP's CEO on

behalf of DAP, provides that Bethancourt "desires to introduce [foreign accounts] to DAP" and

that DAP will pay Bethancourt a percentage of the "transaction based brokerage commissions"

received by DAP with respect to referred accounts. In registering Bethancourt as a FA of DAP

with FINRA, Bethancourt submitted a fingerprint card and other identification information.

55.     However, as with the payments to Pabon and Hurtado, DAP's payments to

Bethancourt and ETC were another sham arrangement contrived by Clarke and Bethancourt.

Bethancourt had no legitimate role in introducing BANDES to DAP — or even a background in

such a business — facts these Defendants took steps to conceal.

56.     Instead, Bethancourt acted largely at the direction of Clarke, his apparent relative.

Nearly all of the compensation that DAP paid to Bethancourt and ETC was deposited into

foreign bank accounts of ETC over which Clarke exercised apparent control. For example,

Clarke exchanged numerous emails with another individual ("CL") concerning opening a bank

or brokerage account for ETC in which Clarke acted solely on behalf of ETC. Clarke and CL

also emailed concerning ETC's account cash ledgers, portfolio options, executing buy and sell

orders, and money transfer authorizations, among other things. In total, Clarke and Bethancourt

participated in arranging for DAP to pay Bethancourt and ETC a total of at least $20.3 million in

connection with BANDES trades. Clarke further arranged for approximately $5.6 million of the

amounts received by Bethancourt and ETC from DAP to be remitted to Gonzalez.

## C.    **Kickbacks to Gonzalez**

57.     The Defendants collectively arranged for a portion of the above-described

18

payments to be remitted to Gonzalez, the BANDES officer who acted as the primary authorized person for the BANDES account(s). Many of the kickback payments were directed to Gonzalez through Cartagena International, Inc. ("Cartagena"), a Panama corporation that is purportedly co-owned by Gonzalez and another individual who is an apparent relative of Gonzalez ("JG").

58.     Clarke regularly emailed Hurtado spreadsheets that detailed payouts on trades for which Pabon or Hurtado were to receive compensation (the "Kickback Spreadsheets"). In the portion of each Kickback Spreadsheet relating to bond trades for BANDES, there is a column — often labeled "Mary" — that refers to Gonzalez. In general, the amount allocated Gonzalez was 20 to 30 percent of the total amount being divided between Pabon or Hurtado and Mary.

59.     For example, on August 21, 2009, Clarke sent Hurtado two Kickback Spreadsheets detailing payouts purportedly for Pabon from the markups/markdowns DAP charged on trades in July and month-to-date in August. In the portion of each spreadsheet relating to bond trades for BANDES, in addition to columns for the date of the trade, description of the bond, quantity, purported purchase price, sale price, and markup, there were also columns referring to Gonzalez and Pabon. With respect to July, the column for markups totaled $2,770,150, the column referring to Gonzalez totaled $546,050 (20 percent), and the column referring to Pabon totaled $2,224,100 (80 percent). The July Kickback Spreadsheet also detailed an additional $12,797.40 in payouts to Pabon for trades in the Other VZ accounts, for a total of $2,782,947.40, inclusive of the amounts designated for Gonzalez.

60.     Clarke participated in arranging for DAP to pay this exact amount — $2,782,947.40 — on August 27, 2009 to Pabon for July trades. Clarke, Hurtado and Pabon each understood that Hurtado and/or Pabon would arrange for $546,050 (the amount indicated in the Kickback Spreadsheet) to be paid to Gonzalez.

61.    In at least one instance, Hurtado also sent a wire payment to JG directly as a means to pay to Gonzalez for kickbacks owed on BANDES trades. A Kickback Spreadsheet sent from Clarke to Hurtado indicates that "Mary" was owed commissions of $509,250 for May 2009. In mid-July 2009, Gonzalez sent Hurtado an email message instructing Hurtado to wire precisely the same amount ($509,250) to an account in JG's name. Hurtado wired this sum to JG approximately a week later.

62.    As described above, beginning with respect to trades executed in August 2009, the Defendants modified their fraudulent arrangement so that all or nearly all of the kickbacks owed to Gonzalez were instead paid through ETC or Bethancourt.

63.    Accordingly, for the remainder of 2009, Clarke participated in arranging for DAP to pay ETC the year-end total of the amount still owed to Gonzalez (approximately $1.9 million) with the understanding that ETC would remit that amount to Gonzalez. DAP paid this amount to ETC in addition to ETC's receipt of monthly payouts totaling approximately $12.3 million through December 2009 (approximately 25 percent of DAP Global's revenues generated by BANDES trades in markups/markdowns that year) that were retained by Bethancourt and Clarke.

64.    For the period January through June 2010, the kickback amounts that Clarke and Hurtado participated in tracking and accruing totaled approximately $5.5 million. Clarke participated in arranging for DAP and/or DAP's parent company, DAG, to pay Bethancourt at least $3.7 million of that amount for the purpose of ETC remitting that amount to Gonzalez.

65.    Clarke personally directed many of the kickbacks paid to Gonzalez via ETC. Specifically, on at least two occasions, CL, an individual with whom Clarke corresponded concerning ETC's bank and/or brokerage accounts, emailed Clarke Word documents containing

instructions for ETC's Swiss bank to wire $883,488.30 (April 13, 2010) and $700,000 (April 30, 2010), respectively, to Cartagena's Swiss bank account. ETC wired those exact amounts to Cartagena on April 19 and May 6, 2010, respectively.

66.     Although Hurtado and Pabon ceased to be personally responsible for paying kickbacks to Gonzalez out of amounts they received from DAP beginning with August 2009 BANDES trades, Hurtado continued to be involved in tracking and monitoring those kickbacks to Gonzalez. For example, Clarke continued to regularly send Hurtado monthly Kickback Spreadsheets that specified on a trade-by-trade basis the payouts owed to both Hurtado and Gonzalez. Hurtado then sent similar accountings to Gonzalez.

**D.     No Honor Among Thieves: Misrepresentations to Gonzalez and BANDES**

67.     Notwithstanding the kickbacks arrangement, Clarke and Hurtado also participated in providing false information to Gonzalez and/or others at BANDES about the true size of DAP's markups/markdowns. These fraudulent misrepresentations permitted the Defendants to retain a greater share of the profits for themselves.

68.     Clarke and Hurtado had agreed with and represented to Gonzalez that Gonzalez would receive, and was receiving, between 50 to 70 percent of DAP's markups/markdowns on BANDES trades. However, Clarke and Hurtado retained a larger share of DAP's markups/markdowns for themselves by misrepresenting the amount of DAP's markups/markdowns to Gonzalez such that Gonzalez typically only received less than a 10 percent share.

69.     The real arrangement between DAP Global and Hurtado was that, of the percentage of DAP's markup/markdown that Hurtado and Gonzalez would collectively receive,

only approximately 20 to 30 percent of that amount was designated as to be paid to Gonzalez in most instances. The actual percentage of DAP's markups/markdowns on BANDES trades collectively paid to Hurtado and Gonzalez was approximately 25 to 30 percent (making the amount that was designated as to be paid to Gonzalez only approximately 5 to 9 percent of DAP's total actual markups/markdowns).

70.     Clarke and Hurtado used the fact that Gonzalez and BANDES had no way of independently learning the prices at which DAP purchased or sold bonds from the street to accomplish their deception. To create the false appearance that Gonzalez was receiving between 50 and 70 percent of DAP's markups/markdowns on BANDES trades, Clarke and Hurtado participated in creating and/or making use of documents that falsified DAP's street purchase or sale prices and thereby reduced the amount of DAP's markups/markdowns.

71.     That is, in the case of a markup, these documents presented a false, higher price at which DAP purportedly bought the bond from the street together with the correct price at which DAP sold to BANDES, thus netting to a markup on the transaction that was substantially lower than the actual markup DAP charged and falsely appearing to show that the amount due to Gonzalez was 50 to 70 percent of the DAP's total markup.

72.     In furtherance of their scheme, the Clarke and Hurtado documented their misrepresentations in the Kickback Spreadsheets that Clarke emailed to Hurtado. These spreadsheets often contained separate spreadsheet tabs for Gonzalez and Hurtado (or Pabon) with different street prices and markups/markdowns that are apparent attempts to document their two sets of books — *i.e.*, information to be shared with Gonzalez and information shared amongst Clarke and Hurtado.

73.    The following illustrates the chain of deception from Clarke and Hurtado to

Gonzalez:



•Clarke directs DAP's purchase of bonds from the street to sell to BANDES at a markup
•Example: 8/4/09 DAP purchases bonds from street for sale to BANDES at a markup
of $875,000



•Clarke arranges a total of ~25% of DAP's markup to be paid to Hurtado (either through
Pabon as FF or directly as employee compensation) and Gonzalez (either through
Pabon or ETC/Bethancourt), of which ~20-30% is to be paid to Gonzalez
•Example: DAP designates payout from markup totaling $250,000 for Hurtado and
Gonzalez (~28% of DAP's markup), of which $62,500 (25%) is designated as to be
paid to Gonzalez (~7% of DAP's markup)

•DAP's markup is represented to Gonzalez as significantly lower such that payout for
Gonzalez appears to be ~50-70% of DAP's markup, even thought it was only <10%
•Example: DAP's markup falsely represented as $125,000 of which Gonzalez is to
receive $62,500 (50%), even though Gonzalez's share is actually only ~7%

74.    In fact, the only instances in which the Kickback Spreadsheets present accurate

street price and markup/markdown information in the Gonzalez spreadsheet tab is for two large

round-trip trades described below — *i.e.*, transactions for which Gonzalez and BANDES would

independently know the purchase and sale prices. Clarke, Hurtado, and Gonzalez had arranged

for these two blatantly fraudulent round-trip trades in order to generate profits for themselves of

more than $10.5 million. Gonzalez was to actually receive half of these profits because Clarke

and Hurtado could not deceive her about DAP's actual markups on these two trades.

**E.    DAP Global Generated More than $66 Million through the Defendants' Scheme.**

75.    DAP Global's ability to charge inflated markups/markdowns on BANDES trades

depended on the payment of kickbacks to BANDES officer Gonzalez in exchange for this order

flow of bond trades. The Defendants and Gonzalez concealed the fact that they intended to, and

did, compensate Gonzalez personally in connection with DAP's trade executions for BANDES.

76.     Clarke participated in generating this fraudulent revenue from markups in "riskless principal" transactions by marking up bonds that BANDES purchased and marking down bonds that BANDES sold.  For example, when BANDES placed orders with DAP to purchase Venezuelan bonds, Clarke and/or DAP Global personnel in Miami or New York accepted BANDES' order; executed a buy order with the market to fill the BANDES order though DAP's riskless principal accounts; and then immediately sold the bonds DAP purchased from the market to BANDES' accounts held at DAP's clearing brokers at a markup.  DAP had no or minimal risk when entering into the transactions, incurred minimal expenses in executing the trades, and performed services primarily limited to inquiring with a handful of large broker desks for bid/ask offers and execution-related activities.

77.     DAP performed the relevant bond trading domestically, in the U.S. over-the-counter markets.  In order to execute trades for BANDES, DAP established Delivery-Versus-Payment/Receive-Versus-Payment (DVP/RVP) accounts for BANDES at DAP's clearing brokers, all U.S. entities.  Gonzalez was an authorized person for these BANDES accounts.  DAP accepted orders from BANDES in DAP's offices in the United States, specifically in Miami, Florida and/or New York, New York.  The counterparty sources in DAP's trades for BANDES were predominantly U.S. broker-dealers or U.S. broker-dealer subsidiaries of foreign entities.  DAP traders arranged the trades with other U.S.-based traders at these broker-dealers via telephone or through electronic communications over a software platform operated by a U.S. company, entered and agreed upon the terms of the trades over the same software platform and executed all trades through DAP's riskless principal accounts at its clearing brokers, all U.S. entities.  The trades also settled, with DAP receiving its markup or

markdown on the trades, through DAP's riskless principal accounts at its U.S. clearing brokers.

78.    In generating these markups/markdowns, DAP Global personnel, including

Clarke, intentionally misled DAP's clearing brokers, inter-positioned another broker-dealer, and

executed two large roundtrip trades that resulted in BANDES paying more than $10.5 million in

markups on two trades for no legitimate business purpose.

### 1.    Basic Markups

79.    For many trades, DAP Global personnel simply marked up (or down) the bonds

in an amount directed by Clarke. In several instances, DAP's markups/markdowns were,

without justification, well in excess of 5 percent.

80.    For example, on July 8, 2009, pursuant to a BANDES order for $20.9 million in

face value Petroleos de Venezuela, S.A. ("PDVSA") bonds maturing in 2037, DAP Global

personnel purchased of the bonds from the street into DAP's riskless principal account at one of

its clearing brokers ("Clearing Broker 1") at an average price of 40.08 for a total of $8,667,818,

and then immediately sold the bonds out of its riskless principal account to BANDES at an

average price of 43.50 for a total of $9,382,068, a markup of $714,250 or approximately 7.6

percent. Clarke participated in arranging for DAP to pay Pabon as a purported FF $253,125 for

these trades, out of which Pabon was to remit $50,625 to Gonzalez. Clarke also arranged for

DAP to pay ETC approximately $178,500 for these trades.

### 2.    Large Round-Trip Trades

81.    Among the most egregious conduct of the fraudulent scheme, Clarke, Hurtado,

and Gonzalez also arranged for two blatantly fraudulent round-trip trades in order to generate

profits for themselves of more than $10.5 million. Specifically, on January 28, 2010, Clarke and

Hurtado arranged with Gonzalez for BANDES to submit simultaneous buy and sell orders for

$132 million in face value bonds of Electricidad de Caracas ("ELECAR"), a Venezuelan electricity company. In these transactions, DAP purchased the bonds from BANDES at 66.00 for a total of $90,673,000, and DAP then immediately sold the same bonds back to BANDES at an average price of 70.00 for a total of $95,953,000, a markup of $5,280,000 or 5.5 percent.

82.     On the following day, January 29, these Defendants arranged a near-identical transaction for $131 million face value ELECAR bonds, in which BANDES sold the bonds to DAP at 66.00 for a total of $90,017,014, and DAP then immediately sold the same bonds back to BANDES at 70.00, for a total of $95,257,014, a markup of $5,240,000 or 5.5 percent.

83.     In total, DAP generated a profit (and BANDES lost) $10,520,000 on these two trade executions that had no legitimate business purpose.

84.     As described further herein, because Gonzalez independently knew the real purchase and sale prices on these fraudulent round-trip trades, Clarke and Hurtado were unable to deceive Gonzalez and retain a greater share of the profits with respect to these trades.

85.     Therefore, Clarke and Hurtado arranged for DAP to pay half of DAP's actual profits on these transactions ($5,260,000) to Gonzalez. For example, Clarke arranged for at least $3.7 million of that amount to be paid by DAP to Bethancourt with the understanding that those funds would be remitted to Gonzalez.

86.     In addition to the amounts owed to Gonzalez, Clarke participated in arranging for DAP to compensate Hurtado (as a purported back-office employee) and Bethancourt (as a purported FA) each approximately $1,052,000 for these round-trip transactions.

### 3.     Wash Trades and Inter-positioning to Deceive DAP's Clearing Brokers

87.     A "wash trade" is a securities transaction which involves no change in the beneficial ownership of the security.

88.     DAP Global personnel executed at least 60 "internal" fictitious wash trades in which, to fill BANDES' order, DAP bought from the street into its riskless principal account at Clearing Broker 1 and sold at a markup to its riskless principal account at another clearing broker ("Clearing Broker 2") only to sell at yet another markup to BANDES.

89.     In at least some instances, Clarke participated in arranging for these "internal" wash trades to conceal from Clearing Broker 1 that DAP was executing trades with BANDES after Clearing Broker 1 had restricted DAP from executing trades for BANDES due to anti-money laundering and compliance concerns.

90.     For example, on July 28, 2009, DAP Global personnel filled BANDES' order by executing a series of same day transactions in which DAP bought a total of $20 million in face value Venezuelan bonds maturing in 2037 from the street into DAP's riskless principal account at Clearing Broker 1 at an average price of 41.09 for a total of $8,547,500. In order to conceal from Clearing Broker 1 that the ultimate purchaser of these bonds was BANDES, an internal trade was executed in which the bonds were sold from DAP's Clearing Broker 1 account to its Clearing Broker 2 account for a total of $8,953,750, an initial markup of $406,250, and then for the immediate sale of the bonds from the Clearing Broker 2 account to BANDES at an average price of 44.12 for a total of $9,160,000, a further incremental markup of $206,250 for a total markup of $612,500 or approximately 6.7 percent.

91.     Clarke participated in arranging for DAP to pay Pabon as a purported FF $200,000 for these trades, out of which Pabon was to remit $40,000 to Gonzalez. Clarke also arranged for DAP to pay ETC as a FF approximately $153,000 for these trades.

92.     In some instances, DAP Global personnel combined executing "internal" wash trades with inter-positioning another broker-dealer (the "In-Between Broker") between DAP and

BANDES. DAP Global personnel approached the In-Between Broker to inter-position itself
between DAP and BANDES by having DAP purchase bonds from the street, sell them to the In-
Between Broker at a markup, and have the In-Between Broker sell the bonds to BANDES at a
small additional markup that the In-Between Broker retained.

93.     In at least some instances, DAP Global personnel arranged for these inter-
positioning trades with the In-Between Broker to conceal from Clearing Broker 1 that DAP was
executing trades with BANDES after Clearing Broker 1 had restricted DAP from executing
trades for BANDES.

94.     For example, on July 29, 2009, DAP Global personnel filled BANDES' order by
executing a series of same day transactions in which DAP Global bought $20 million in face
value Venezuela bonds maturing in 2037 into its Clearing Broker 1 riskless principal account at
an average price of 41.125 for a total of $8,564,167. In order to conceal from Clearing Broker 1
that the ultimate purchaser of these bonds was BANDES, DAP Global personnel arranged for an
"internal" wash sale for half of the bonds from its Clearing Broker 1 account to its Clearing
Broker 2 account before selling to BANDES at an aggregate markup of approximately $155,000.

95.     DAP Global personnel further arranged for the sale of the other half of these
bonds ($10 million face value) at an average price of 42.775 to the In-Between Broker for a total
of $4,447,083, a markup of approximately $165,000 or approximately 3.7 percent. The In-
Between Broker then immediately sold the bonds to BANDES at an average price of 42.875 (an
additional markup of $10,000 to the In-Between Broker), creating an aggregate markup of
approximately 3.9 percent.

96.     With respect to these trades of $20 million face value in bonds, Clarke
participated in arranging for DAP to pay Pabon as a purported FF approximately $112,500 for

these trades, out of which Pabon was to remit approximately $22,500 to Gonzalez. Clarke also arranged for DAP to pay ETC approximately $80,000 for these trades.

**F.**    **Summary of Fraudulently Obtained Compensation**

97.    The Defendants collectively arranged for at least $9.1 million to be paid as kickbacks to Gonzalez on BANDES trades out of the profits DAP Global generated from markups/markdowns charged on BANDES trades in connection with their fraudulent scheme. Each of the Defendants also received significant compensation resulting from their participation in the fraudulent scheme described herein:

      a.    Pabon received (and/or expected to receive) approximately $9.26 million in sham FF fees from DAP for accounts that she did not introduce to DAP and during a time period in which she was not eligible to act as a FF. Pabon was expected to remit approximately $1.7 million of these amounts to Gonzalez in connection with the fraudulent scheme.

      b.    Hurtado received (and/or expected to receive) at least $6.1 million in sham compensation from DAP as a purported "back office" employee that was actually improper transaction-based compensation paid to a non-registered person in violation of applicable regulations.

      c.    ETC and Bethancourt received (and/or expected to receive) approximately $20.3 million in sham FF/FA fees from DAP, nearly all of which was deposited into ETC accounts over which Clarke also exercised control and benefited therefrom. ETC and Bethancourt were expected to remit at least $5.6 million of these amounts to Gonzalez in connection with the fraudulent scheme.

d.      By virtue of the arrangement with DAP in which the DAP Global

Principals were collectively entitled to receive 60 percent of the net profits of

DAP Global, the DAP Global Principals were entitled to collectively receive

approximately $19 million from DAP for the period January 2009 through June

2010, of which more than $17 million is attributable to BANDES

markups/markdowns in connection with the fraudulent scheme.   Clarke's share of

those amounts was 20 percent.

### FIRST CAUSE OF ACTION

### Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act
### (Against All Defendants)

98.      Paragraphs 1 through 97 are realleged and incorporated by reference as if fully set

forth herein.

99.      Defendants Clarke, Hurtado, Pabon, and Bethancourt, directly or indirectly, singly

or in concert, by use of the means or instruments of transportation or communication in interstate

commerce or by the use of the mails, in the offer or sale of securities, (i) knowingly or

recklessly, have employed or are employing devices, schemes and artifices to defraud; and/or (ii)

knowingly, recklessly, or negligently, have engaged in acts, transactions, practices or courses of

business which operated or would operate as a fraud or deceit upon purchasers of securities.

100.      By reason of the foregoing, Defendants Clarke, Hurtado, Pabon, and Bethancourt,

directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate,

Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

## SECOND CAUSE OF ACTION

**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c)
Thereunder
(Against All Defendants)**

101.    Paragraphs 1 through 97 are realleged and incorporated by reference as if fully set

forth herein.

102.    Defendants Clarke, Hurtado, Pabon, and Bethancourt, directly or indirectly, singly

or in concert, in connection with the purchase or sale of securities, by the use of means or

instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities

exchange, have knowingly or recklessly: (i) employed or are employing devices, schemes, or

artifices to defraud; and/or (ii) engaged in acts, transactions, practices, or courses of business

which operated or would operate as a fraud or deceit upon any person.

103.    By reason of the foregoing, Defendants Clarke, Hurtado, Pabon, and Bethancourt,

directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate,

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c)

thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

## THIRD CAUSE OF ACTION

**Aiding and Abetting Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and
10b-5(c) Thereunder
(Against All Defendants)**

104.    Paragraphs 1 through 97 are realleged and incorporated by reference as if fully set

forth herein.

105.    As alleged herein and as set forth above, each of the Defendants violated Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17

C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)] when, by the use of means or instrumentalities of

31

interstate commerce, of the mails, or of the facilities of a national securities exchange, directly or

indirectly, singly or in concert, in connection with the purchase or sale of securities, they

knowingly or recklessly: (i) employed or are employing devices, schemes, or artifices to defraud;

and/or (ii) engaged in acts, transactions, practices, or courses of business which operated or

would operate as a fraud or deceit upon any person.

106.    By reason of the foregoing, each of Defendants Clarke, Hurtado, Pabon, and

Bethancourt knew of the violations of each of the other Defendants and each of them knowingly,

or with the requisite scienter, provided substantial assistance to each of the other Defendants'

violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder.

107.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants

Clarke, Hurtado, Pabon, and Bethancourt aided and abetted, and unless enjoined and restrained

will continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-

5(c)].

### FOURTH CAUSE OF ACTION

**Aiding and Abetting Violations of Exchange Act Section 15(c)(1)(A) and Rule 10b-3**
**Thereunder**
**(Against All Defendants)**

108.    Paragraphs 1 through 97 are realleged and incorporated by reference as if fully set

forth herein.

109.    At all relevant times, DAP was a registered broker dealer pursuant to Section

15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

110.    As alleged herein, DAP, directly or indirectly, by use of the means or

instrumentality of interstate commerce, of the mails, or of any facility of any national securities

exchange, used or employed, in connection with the purchase or sale, or the inducement or attempted inducement of the purchase or sale, of securities otherwise than on a national securities exchange, acts, practices, or courses of business that constitute a manipulative, deceptive, or other fraudulent device or contrivance.

111.    By reason of the foregoing, DAP violated Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3].

112.    As further alleged herein, Defendants Clarke, Hurtado, Pabon, and Bethancourt knowingly, or with the requisite scienter, provided substantial assistance to DAP's violations of Section 15(c)(1)(A) of the Exchange Act and Rule 10b-3 thereunder.  Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants Clarke, Hurtado, Pabon, and Bethancourt aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3].

### FIFTH CAUSE OF ACTION
**Aiding and Abetting Violations of Exchange Act Rule 15b7-1**
**(Against Defendants Clarke and Hurtado)**

113.    Paragraphs 1 through 97 are realleged and incorporated by reference as if fully set forth herein.

114.    At all relevant times, DAP was a registered broker dealer pursuant to Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)] and a member of FINRA and NYSE.

115.    As alleged herein, DAP failed to register Defendant Hurtado as an associated person of DAP, and failed to ensure that Hurtado passed the requisite qualification examinations,

33

while Hurtado was associated with DAP and effected or was involved in effecting transactions in, or inducing the purchase or sale of, securities.

116. By reason of the foregoing, DAP violated Exchange Act Rule 15b7-1 [17 C.F.R. § 240.15b7-1].

117. Defendants Clarke and Hurtado knew that Hurtado was not registered with FINRA, and that Hurtado had not passed the requisite qualification examinations, while Hurtado was effecting or involved in effecting transactions in securities for DAP, and knew that Hurtado needed to be registered with FINRA, and to have passed such examinations, in order to conduct such activities.

118. Defendant Clarke failed to cause the registration of Hurtado with FINRA, and to ensure that Hurtado passed the requisite qualification examinations, even though Defendant Clarke arranged for and permitted Hurtado to be compensated by DAP for effecting or be involved in effecting transactions in securities.

119. Defendants Clarke and Hurtado thus knowingly, or with the requisite scienter, provided substantial assistance to the violations of Exchange Act Rule 15b7-1 [17 C.F.R. § 240.15b7-1] by DAP.

120. Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants Clarke and Hurtado, aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Exchange Act Rule 15b7-1 [17 C.F.R. § 240.15b7-1].

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that this Court issue a Final Judgment:

**I.**

Permanently restraining and enjoining the Defendants, their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from (i) violating Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)]; (ii) violating and/or aiding and abetting violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. § 240.10b-5]; and (iii) aiding and abetting violations of Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3].

**II.**

Permanently restraining and enjoining Defendants Clarke and Hurtado, their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting violations of Exchange Act Rule 15b7-1 [17 C.F.R. § 240.15b7-1].

**III.**

Ordering each of the Defendants to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**IV.**

Ordering each of the Defendants to disgorge, with prejudgment interest thereon, all ill-gotten gains each received directly or indirectly as a result of the misconduct alleged in this Complaint.

**V.**

Granting such other and further relief as the Court deems just and appropriate.

Dated: May 7, 2013
       New York, New York

                              By: _____
                                  Andrew M. Calamari
                                  Regional Director
                                  New York Regional Office
                                  Securities and Exchange Commission
                                  3 World Financial Center, Suite 400
                                  New York, New York 10281-1022
                                  Tel: (212) 336-0589 (Howard A. Fischer,
                                  Senior Trial Counsel)
                                  fischerh@sec.gov

Of Counsel:

    Michael J. Osnato, Jr.
    Wendy B. Tepperman
    Howard A. Fischer
    Amanda L. Straub