**ANDREW M. CALAMARI**
**REGIONAL DIRECTOR**
**Amelia A. Cottrell**
**Wendy B. Tepperman**
**Howard A. Fischer**
**Amanda L. Straub**
**Attorneys for Plaintiff**

**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**3 World Financial Center, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0589 (Fischer)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | |
| **TOMAS ALBERTO CLARKE BETHANCOURT,** | : | 13 CV 3074 (JMF) |
| **JOSE ALEJANDRO HURTADO, HAYDEE** | : | **ECF CASE** |
| **LETICIA PABON, IURI RODOLFO** | : | |
| **BETHANCOURT, ERNESTO LUJAN,** | : | **SECOND** |
| **BENITO CHINEA and JOSEPH FLORES** | : | **AMENDED** |
| **DEMENESES JR.,** | : | **COMPLAINT** |
| | : | |
| **Defendants.** | : | |
| | : | |

---

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Tomas Alberto Clarke Bethancourt ("Clarke"), Jose Alejandro Hurtado ("Hurtado"),

Haydee Leticia Pabon ("Pabon"), Iuri Rodolfo Bethancourt ("Bethancourt"), Ernesto Lujan

("Lujan"), Benito Chinea ("Chinea"), and Joseph Flores DeMeneses, Jr. ("DeMeneses")

(collectively, "Defendants"), alleges as follows:

<u>**SUMMARY OF ALLEGATIONS**</u>

1.     This action arises from a massive fraudulent scheme involving tens of millions of dollars of illicit kickbacks and other "pay to play" arrangements among individuals affiliated with a New York broker-dealer, Direct Access Partners, LLC ("DAP"), and at least one corrupt senior official of a Venezuelan state-created and owned banking entity, Banco de Desarrollo Económico y Social de Venezuela ("BANDES").

2.     In October 2008, Defendant Chinea, DAP's co-founder and CEO, hired Defendants Lujan, DeMeneses, and Clarke  to form and run a new internal division for DAP, the Global Markets Group ("DAP Global"), which would primarily execute fixed income trades for customers in foreign sovereign debt.  BANDES was a new customer to DAP brought in by Lujan, DeMeneses, and Clarke through their connections to Defendant Hurtado.

3.     Between January 2009 and June 2010, DAP Global generated more than $66 million in revenue for DAP from transaction fees — in the form of markups and markdowns — on riskless principal trade executions in Venezuelan sovereign or state-sponsored bonds for BANDES.  This revenue was the result of a multifaceted kickback scheme orchestrated by the Defendants in which a portion of this revenue was illicitly paid to BANDES Vice President of Finance, María (Mary) de los Ángeles González de Hernandez ("Gonzalez"), who authorized the fraudulent trades, and to Defendants Hurtado, Pabon, and Bethancourt for their roles in the scheme.  Chinea participated in the kickback scheme by facilitating the flow of payments to Gonzalez, including by arranging for DAP to reimburse DeMeneses and Clarke for kickback payments made from their personal funds to a shell entity controlled by Gonzalez.

4.     After these payouts and other expenses, Lujan, DeMeneses, and Clarke

(collectively, the "DAP Global Principals") shared 60 percent of DAP Global's net profits. The remainder of the net profits flowed to Chinea and other executives or principals of DAP and DAP's holding company.

5.      As a result of the Defendants' kickbacks to Gonzalez, DAP obtained BANDES' lucrative trading business and provided Gonzalez with the incentive to enter into trades with DAP at considerable markups or markdowns and without regard to the prices paid by BANDES.

6.      Notwithstanding the kickbacks paid, Defendants Lujan, Clarke, and Hurtado, directly and indirectly, falsified the size of DAP's markups to BANDES personnel and/or Gonzalez, which enabled them to retain a greater share of the fraudulent profits.

7.      In addition, Defendants Lujan, DeMeneses, Clarke, Hurtado, and Pabon engaged in a similar fraudulent kickback scheme with respect to Banfoandes Banco Universal C.A. ("Banfoandes"), another state-owned Venezuelan bank. As in the BANDES scheme, these Defendants arranged to pay a portion of the markups from securities trades to an officer at the bank in exchange for the bank's business.

## SECURITIES LAWS VIOLATIONS

8.      By virtue of the foregoing conduct and as alleged further herein, Defendants Chinea, Lujan, DeMeneses, Clarke, Hurtado, Pabon, and Bethancourt, singly or in concert, directly or indirectly, have engaged in acts, practices, schemes, transactions, and courses of business that violated Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

9.      Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], each of the

Defendants is liable for aiding and abetting: (i) the other Defendants' and/or DAP's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)]; and (ii) DAP's violations of Section 15(c)(1)(A) [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3].

10.     Defendants Lujan, Clarke, and Hurtado have also**,** singly or in concert, directly or indirectly, made false and/or misleading statements of material facts that violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].  Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants Lujan, Clarke, and Hurtado are also liable for aiding and abetting each other's and/or DAP's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

11.     In addition, Defendants Chinea, Lujan, Demeneses, Clarke, and Hurtado, under Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], are also liable for aiding and abetting DAP's violations of Exchange Act Rule 15b7-1 [17 C.F.R. § 240.15b7-1].

12.     Defendants Lujan, DeMeneses, Clarke, and Hurtado, under Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)],  are also liable for aiding and abetting DAP's violations of Exchange Act Section 17(a) [15 U.S.C. § 78q(a)] and Rules 17a-4(b)(4) and (j) thereunder [17 C.F.R. §§ 240.17a-4(b)(4) & (j)].

13.     Unless permanently restrained and enjoined, each Defendant will again engage in the acts, practices, schemes, transactions, and courses of business set forth in this Complaint, and in acts, practices, schemes, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

14.     The Commission brings this action pursuant to the authority conferred by Section

20 of the Securities Act [15 U.S.C. § 77t] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] seeking, among other things, to restrain and enjoin permanently the Defendants from engaging in the acts, practices, schemes, transactions, and courses of business alleged herein.  In addition to injunctive relief, the Commission seeks: (a) final judgments ordering the Defendants to disgorge their ill-gotten gains, with prejudgment interest; (b) final judgments ordering the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)]; and (c) such equitable and other relief as the Court deems just, appropriate or necessary for the benefit of investors [15 U.S.C. § 78u(d)(5)].

15.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  The Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of interstate commerce, of the mails, the facilities of national securities exchanges, and/or the means or instruments of transportation or communication in interstate commerce in connection with the acts, practices, and courses of business alleged herein.

16.     Venue in the Southern District of New York is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, transactions, and courses of business alleged herein occurred in this district, including, but not limited to, at DAP's New York office.

## DEFENDANTS

17.     **Defendant Chinea**, 47, also known as "Ben," is a U.S. citizen and resident of Manalapan, New Jersey.  Chinea co-founded DAP in 2002 and served as CEO of DAP until August 2013.  Chinea held FINRA Equity Trader, General Securities Principal, and General

Securities registrations.

18.     **Defendant DeMeneses**, 44, also known as "Joe," is a U.S. citizen and resident of Fairfield, Connecticut.  DeMeneses served as DAP's Managing Partner of Global Strategy, which included responsibilities within DAP Global, from the time he joined DAP in October 2008 until April 2013.  DeMeneses holds FINRA Equity Trader, General Securities Principal, and General Securities registrations.

19.     **Defendant Lujan**, 51, is a U.S. citizen and resident of Wellington, Florida. Lujan was hired by DAP in October 2008, together with DeMeneses, Clarke, and others who previously worked at another broker-dealer registered with the Commission.  Lujan served at DAP as the Managing Partner of DAP Global and was responsible for running DAP's Miami office until May 2013.  Lujan held FINRA General Securities Supervisor and Representative registrations.

20.     **Defendant Clarke**, 44, also known as "Tomas Clarke," is a U.S. citizen and resident of Miami, Florida.  Clarke was hired by DAP in October 2008 and served as an Executive Vice President in fixed income within DAP Global, working out of DAP's Miami branch office, until May 2013.  Clarke held a General Securities Representative registration. Defendants Clarke and Bethancourt are relatives; Clarke's mother's maiden name is "Bethancourt."

21.     **Defendant Bethancourt**, 41, resides in Panama.  Bethancourt purports to be the President of ETC Investment, S.A. ("ETC"), a Panama corporation formed in 2004.  Defendant Clarke holds a power of attorney for ETC and exercised control over ETC's bank accounts. Bethancourt has worked as a bank teller and operations officer at various banks in Panama.  DAP made payments of more than $20 million to ETC and Bethancourt in connection with the

fraudulent scheme described herein.

22.     **Defendant Hurtado**, 39, also known as "Alejandro" or "Alejo," is a U.S. citizen and resident of Miami, Florida.  Hurtado was born in Colombia and became a U.S. citizen in or before September 2008.  Hurtado was hired by DAP as a purported non-registered "back office" employee as of July 1, 2009.  DAP made payments of more than $6 million to Hurtado in connection with the fraudulent scheme described herein.  Hurtado is married to Defendant Pabon.

23.     **Defendant Pabon**, 34, is a resident of Miami, Florida.  Pabon was born in Venezuela, but has resided in Florida since 2000.  Pabon is the Director for International Sales in Eastern Europe, the Middle East, and Russia for a Miami-based distributor of Venezuelan cable television network programs.  DAP made payments of more than $8 million to Pabon in connection with the fraudulent scheme described herein.

<u>**OTHER RELEVANT PERSONS**</u>

24.     **DAP** is a New York limited liability corporation formed in 2002 with its principal place of business in New York, New York.  DAP is a broker-dealer registered with the Commission and is a member of the Financial Industry Regulatory Authority ("FINRA"), New York Stock Exchange ("NYSE"), NYSE MKT, and NASDAQ.  DAP is owned by Direct Access Group LLC ("DAG").  DAG has filed for Chapter 11 bankruptcy.

25.     **BANDES** is a Venezuelan state-owned banking entity that acts as the financial agent of the state to finance economic development projects.

26.     **Gonzalez**, 55, is a Venezuelan citizen and served at all relevant times as a senior officer of BANDES serving as the "Vicepresidencia de Finanzas" (Vice President of Finance) or

"Gerente Ejecutiva de Finanzas y Administración de Fondos" (Executive Manager of Finance and Funds Administration).  She was an authorized person on the BANDES account(s) with DAP and the primary point of contact for DAP.

27.     **Banfoandes** was a Venezuelan state-owned development bank.  In late 2009, the Venezuelan government combined Banfoandes with other institutions to form Bicentenario Banco Universal C.A.

**FACTUAL ALLEGATIONS**

A.     **Overview**

28.     DAP was co-founded by Defendant Chinea in 2002 as a brokerage firm on the floor of the NYSE and the American Stock Exchange.  Prior to October 2008, DAP primarily provided equity execution services on an agency or riskless principal basis to institutional customers.

29.     In 2007 and 2008, DAP reported revenues of approximately $15 million and $27 million, respectively, almost exclusively from unsolicited equity transaction commissions. DAP's revenues soared in 2009 to $75 million (five times what it had been only two years before) and were $31 million in the first half of 2010, with the increase almost exclusively due to the fraudulent scheme described herein.

30.     In October 2008, Defendants Lujan, DeMeneses, and Clarke initiated DAP Global's business of providing customers with fixed income trade execution services.  With respect to bond trades, DAP Global generated revenue by marking up bond purchases and marking down bond sales in "riskless principal" transactions.  A riskless principal transaction is the economic equivalent of an agency trade.  Like an agent, a firm engaging in such trades has no

market function, buys only to fill orders already in hand, and immediately books the securities it

buys to its customers.  Essentially, the firm serves as an intermediary for others who have

assumed the market risk on any particular transaction.  In such transactions, if a customer wishes

to purchase a bond, a broker-dealer locates the bond, purchases it on the open market, and then

resells it to its customer at a markup.  The reverse is true when a customer sells a bond (and the

broker-dealer earns a markdown).  Clarke was primarily responsible for overseeing the execution

of the trades and tracking the markups/markdowns on those trades.  Lujan supervised Clarke's

trade executions and the determination of those markups/markdowns.

31.    DAP agreed to pay the three DAP Global Principals – Lujan, DeMeneses, and

Clarke — 60 percent of the net profits generated by DAP Global.  Net profits were defined as

revenues generated by DAP Global from markups/markdowns and equity commissions revenues

minus DAP Global's clearing, business, and other expenses (including payments to Defendants

Bethancourt, Hurtado, and Pabon).  Of the 60 percent revenue allocation to the DAP Global

Principals, Lujan received 67.5 percent, Clarke received 20 percent, and DeMeneses received

12.5 percent.

32.    Between January 2009 and June 2010, DAP Global generated revenues of

approximately $74 million on unsolicited trades executed on an agency or riskless principal

basis.  This figure constituted more than 70 percent of DAP's total revenues (totaling

approximately $106 million) for that period.  From DAP Global net profits of approximately $32

million, the DAP Global Principals were entitled to approximately $19 million pursuant to their

60 percent agreement (of which Lujan's 67.5 percent share was approximately $12.8 million,

Clarke's 20 percent share approximately $3.8 million, and DeMeneses' 12.5 percent share

approximately $2.375 million).

33.     Of the approximately $74 million in total DAP Global revenue generated between January 2009 and June 2010, more than $66 million — in excess of 90 percent — was from markups/markdowns charged on riskless principal trades executed by DAP in Venezuelan sovereign or state-sponsored bonds for BANDES.  Accordingly, on a proportional basis, the three DAP Global Principals collectively earned for themselves more than $17 million (90 percent of $19 million) from markups/markdowns on trade executions for BANDES, with Lujan's, Clarke's and DeMeneses' shares being more than $11.5 million, $3.4 million and $2.1 million, respectively.  In executing some of these trades for BANDES, Lujan, DeMeneses, and Clarke participated in intentionally deceiving DAP's clearing brokers, executing internal wash transactions, inter-positioning another broker-dealer, and engineering at least two large same day roundtrip trades, as described in more detail below.

34.     At all relevant times, Gonzalez was BANDES' Vice President of Finance and an authorized person for the BANDES account(s) with DAP.  BANDES, as well as a number of other Venezuelan-related customers/counterparties, were brought to DAP by the DAP Global Principals through their connection to Hurtado.  The ability of the DAP Global Principals to generate more than $66 million in markups/markdowns for DAP Global — and to collectively earn themselves personally at least $17 million — was tied to a multifaceted kickback scheme in which a portion of DAP's markups were improperly directed to Gonzalez and Hurtado.

35.     As an individual who both authorized the trades on behalf of BANDES and personally received kickbacks based on DAP's markups in executing those trades, Gonzalez had the incentive to enter into trades on behalf of BANDES without regard to the prices paid by

BANDES.  Gonzalez received and/or expected to receive at least $9 million for BANDES trades from 2009 through June 2010.

36.     In order to facilitate this fraudulent arrangement, the Defendants participated in arranging for DAP to pay as expenses approximately half of the revenue generated from markups/markdowns on BANDES trades disguised as various forms of sham compensation to Hurtado (either directly or through his then-fiancée, Pabon) and to Bethancourt (over which Clarke exercised control), with the understanding that a portion of those payments would then be remitted to Gonzalez.

37.     Hurtado was compensated for this scheme: (i) initially, for BANDES trades through July 2009, by DAP's payments of approximately $8.6 million in purported foreign finder ("FF") fees to Hurtado's then-fiancée, Pabon, and (ii) subsequently, beginning for BANDES trades in August 2009, by DAP's payments of approximately $6.1 million directly to Hurtado as salary and bonus in his purported capacity as a newly hired non-registered "back office" DAP employee.  Hurtado in turn directed a portion of these amounts to Gonzalez.  Chinea reviewed and approved the payments to Pabon and Hurtado on at least a monthly basis.

38.     In addition to their compensation from DAP, Clarke, DeMeneses, and Lujan also shared in the compensation that was paid to Bethancourt in the scheme.  As such, Bethancourt acted as a "front" for Clarke, DeMeneses and Lujan to collect additional compensation in connection with this scheme.  Bethancourt  received compensation: (i) initially in 2009, by DAP's payment of purported FF fees to ETC, and (ii) beginning in 2010, by DAP's payments directly to Bethancourt of purported foreign associate ("FA") fees.  Nearly all of DAP's payments to ETC and Bethancourt — totaling more than $20 million — were deposited to ETC

11

accounts over which Clarke exercised control.  Clarke directed portions of these amounts from accounts of ETC to those of entities associated with Lujan and Gonzalez and reserved amounts in ETC's accounts for DeMeneses.

39.     The kickback scheme generally worked as follows.  <u>First</u>, when BANDES wanted to purchase Venezuelan bonds through DAP, Clarke gathered information on market bid-ask spreads for the bonds and requested "offer" prices from one or more third-party dealers.  Clarke then provided to BANDES, either directly by phone or indirectly through Hurtado, a price on the bonds to BANDES that would include a significant markup for DAP.  <u>Second</u>, the DAP Global Principals and Chinea arranged for DAP to pay approximately half this markup revenue to facilitate improper kickbacks to Gonzalez, Hurtado, and/or others.  <u>Third</u>, a portion of the payments DAP made to Pabon, Hurtado, Bethancourt, and ETC were remitted to Gonzalez.  The following illustrates the basic flow of funds:



40.     Defendant Chinea participated in this kickback scheme and was aware of the payments to Gonzalez.   Chinea also arranged for DAP to compensate DeMeneses and Clarke for personal funds they routed to Gonzalez through ETC, disguising the repayments to DeMeneses and Clarke on DAP's books in part as loans.

41.     Notwithstanding the kickbacks paid to Gonzalez, as part of their scheme, Lujan,

Clarke, and Hurtado also directly and indirectly deceived and provided false information to

Gonzalez as to the amount of DAP's markups/markdowns in order to retain a larger share of the

profits for themselves.

42.     As described in greater detail herein, the Defendants' misconduct in perpetrating

their fraudulent scheme involved numerous fraudulent and deceptive aspects, including:

- Collusion with, and the improper payment of, millions of dollars in kickback payments to the agent (Gonzalez) of the customer (BANDES) to generate inflated markups;

- Misrepresentations to the customer (BANDES) regarding the actual counterparties to trades with BANDES;

- Misrepresentations to representatives of the customer (BANDES), including Gonzalez, regarding the market prices at which DAP obtained the bonds to be sold to BANDES, and therefore the markups DAP earned on BANDES trades;

- Payment of millions of dollars of transaction-based compensation to a non-registered employee (Hurtado) in violation of FINRA and Commission regulations;

- Payment of millions of dollars in purported FF/FA fees (to Pabon and Bethancourt/ETC) on accounts that those purported FF/FAs did not introduce in circumvention of FINRA and Commission regulations;

- Payment of millions of dollars in FF fees to an individual (Pabon) who was ineligible under FINRA rules to qualify as a FF; and

- Practices to generate markups that involved intentionally misleading DAP's clearing brokers, executing "internal" wash trades, inter-positioning another broker-dealer, and at least two large roundtrip trades resulting in BANDES paying more than $10.5 million in markups.

43.     In addition, beginning in October 2008, and continuing at least until June 2009,

Defendants Lujan, DeMeneses, Clarke, Hurtado, and Pabon engaged in a similar fraudulent

kickback scheme with respect to Banfoandes, a state-owned Venezuelan bank.  As in the

BANDES scheme, these Defendants colluded to pay a portion of the markups from trades with

Banfoandes to an officer at the bank in exchange for the bank's business.

**B.**     **DAP's Sham Payments to Hurtado, Pabon, and Bethancourt**

44.     DAP's ability generate the more than $66 million in markups on the BANDES

trades depended on the continued payment of kickbacks by DAP to Gonzalez and Hurtado.  In

order to make the payments necessary for the scheme to Gonzalez and Hurtado, the Defendants

participated in laundering the improper payments through purported FF/FA fees paid to Pabon,

Bethancourt, and ETC, and through purported "back office" non-registered employee

compensation to Hurtado.  Chinea authorized these fraudulent arrangements and payments while

aware that kickbacks were being funneled to Gonzalez.

45.     FINRA's National Association of Securities Dealers ("NASD") and NYSE rules

generally restrict FINRA and NYSE member firms, such as DAP, from paying transaction-based

finders' fees, such as a percentage of markups, to non-registered persons, with limited

exemptions that include those for FFs (NASD Rule 1060 and FINRA Incorporated NYSE Rule

Interpretation 345(a)(i)/03) and FAs (NASD Rule 1100).

46.     NASD Rule 1060(b) and NYSE Rule Interpretation 345(a)(i)/03 permit

transaction-based compensation to be paid to a non-registered foreign person or entity as a FF

based on the business of a customer they direct to a broker-dealer only if certain conditions are

met, including that the finder is a foreign national or foreign entity domiciled abroad and

conducts all activities outside of the United States.  The FF's activities in the business of the

broker-dealer must be limited to the initial referral of non-United States customers to the firm

and the FF may not be an associated person of the firm.  NASD Rule 1100 permits broker-

dealers to employ, register, and pay transaction-based compensation to individuals as FAs only

under certain conditions, including that the individual is not a U.S. citizen or resident, conducts

all securities activities outside of the United States, and registers with FINRA (but is exempt

14

from passing examination requirements).

47.     For individuals conducting any business in the United States, NASD Rules also generally require all member firm personnel who are to function as "representatives" to register with FINRA in an appropriate category of registration, which requires passing one or more examinations.  The NASD has generally interpreted "representatives" to include employees who share in the commissions generated from customer accounts.

48.     In order to circumvent regulations and conceal the payment of kickbacks to Gonzalez necessary for the operation of their scheme, the Defendants participated in arranging for DAP to improperly pay, directly or indirectly, a total of at least $36.8 million from markups/markdowns charged on BANDES trades to Hurtado, Pabon, ETC, Bethancourt and/or other sources, at least $9.1 million of which was to be remitted to Gonzalez.

### 1.     <u>Sham Arrangements with Hurtado and Pabon</u>

49.     As a U.S. resident since 2000 and a U.S. citizen since at least September 2008, Hurtado was not eligible to receive transaction-based compensation under FINRA's exemptions for FFs or FAs and did not qualify for any other exemption to receive finders' fees for the BANDES account.  Hurtado had also not passed the applicable examination(s) required by FINRA in order to be eligible to become a registered "representative" of DAP and thereby be eligible to receive transaction-based compensation.

50.     However, Hurtado was DAP's primary link to Gonzalez and BANDES, and the payouts to Hurtado were necessary for the operation of the scheme.  In addition, Hurtado acted as the primary point of contact between BANDES and DAP Global personnel, and participated in arranging for BANDES' purchases and sales of bonds.  For example, on August 26, 2009, a BANDES employee emailed only Hurtado, copying Gonzalez, with a list of bonds to sell in an

attached spreadsheet.  Hurtado forwarded the email to Clarke.  The following day, Clarke

directed DAP's purchase of the bonds from BANDES at a markdown and sale to the street at

prices generating a profit of approximately $569,822 for DAP (of which Hurtado was to receive

a payout of approximately $168,286.60 and Gonzalez was to receive a kickback of $61,555.90,

as reflected in a spreadsheet created and/or used by Clarke and Hurtado).  Hurtado also

"introduced" DAP Global to a few other smaller Venezuelan-related accounts (the "Other VZ

accounts") prior to BANDES becoming a customer of DAP, and received compensation for

trades in those accounts.

     51.     To circumvent regulations generally prohibiting payment of transaction-based

compensation to non-registered U.S.-based "finders" and to conceal their scheme, Chinea, Lujan,

DeMeneses, Clarke, and Hurtado participated in orchestrating a series of sham arrangements to

conceal Hurtado's improper receipt of payouts with respect to BANDES and the Other VZ

accounts.

     52.     First, prior to BANDES becoming a DAP customer, Lujan, Clarke, and Hurtado

participated in arranging for DAP to conceal payments to Hurtado on trades for the Other VZ

accounts by entering into a purported FF agreement, dated as of November 2008, with Private

Wealth Corporation S.A. ("PWC").  Hurtado was a co-owner of PWC and operated out of

Florida, but PWC purported to be based in Geneva.  The agreement provided that DAP would

pay PWC a certain percentage of DAP's markups/markdowns and equity commissions charged

on accounts introduced by PWC.  However, payments to PWC were merely a conduit for

Hurtado to improperly receive payment on trades for the Other VZ accounts.  It was well-known

to the DAP Global Principals and Chinea that PWC was merely a front for Hurtado.  As a result

of this arrangement, DAP improperly paid PWC approximately $250,000 as purported FF fees for trades in November and December 2008 on the Other VZ accounts.

53.     Chinea, Lujan, DeMeneses, Clarke, and Hurtado, together with Pabon (Hurtado's soon-to-be wife), orchestrated a new iteration of the arrangement for trades beginning in January 2009, in which Hurtado's payouts were paid to Pabon as a purported FF.  Notwithstanding the fact that Pabon had been a U.S. resident since 2000 and therefore was ineligible under the applicable regulations to act as a FF, DAP executed a purported FF agreement with Pabon entitled "International Foreign Finder Commission Share Agreement" dated as of January 2009. The agreement, signed by Pabon and Lujan on behalf of DAP, provides that Pabon "is willing to give [her] clients access to the US stock market by opening accounts [for certain customers] at DAP in the name of such customer[s] for the purpose of having DAP provide execution services out directly for [those] customers" and that DAP would pay Pabon a portion of DAP's profits on referred accounts based upon an agreed upon commission schedule.  The agreement misrepresents Pabon as a foreign national domiciled abroad and, in furtherance of the ruse, Pabon provided a copy of her Venezuelan passport and identification card to DAP through Hurtado.

54.     Purportedly pursuant to this FF agreement, Chinea, Lujan, DeMeneses, and Clarke participated in arranging for DAP to pay Pabon approximately $9.3 million in FF fees relating to trade executions from January through July 2009, with approximately $8.6 million relating to BANDES trades and the remainder relating to trades by the same Other VZ accounts for which PWC previously received FF fees.  The payments to Pabon constituted approximately 25 to 30 percent of DAP Global's revenue generated from these trades.  Approximately $1.7

million of the amounts received by Pabon from DAP were designated to be remitted to Gonzalez. Clarke and Hurtado documented the scheme in spreadsheets that detailed payouts on trades for which Pabon was to receive compensation that also included an allocation of the amount due to Gonzalez.

55.     Payment to Pabon, however, was another sham arrangement contrived by the DAP Global Principals, Chinea, Hurtado, and Pabon.  Pabon had no legitimate role in introducing BANDES or the Other VZ accounts to DAP — or even a background in such a business — facts these Defendants took steps to conceal.

56.     For example, when DAP received an inquiry from the compliance department of one of DAP's clearing brokers concerning its use of FFs in or around August 2009, DAP Global personnel requested that Pabon provide a description of her background.  In response to this request, Pabon sent an email describing her background, stating that she "moved to the United States in 2000 with the purpose of … finishing her college studies" and is "a young executive… involved in [s]ales, [p]ublic relations and marketing industries" as the Director for International Sales in Eastern Europe, the Middle East, and Russia for a Venezuelan television channel.

57.     After receiving a forwarded copy of the email about Pabon's background, DeMeneses wrote to Lujan on August 23, 2009:

> We will have to fix this up a bit…. I would definitely take out the Eastern Europe, Middle East and Russia part – but we could talk up the contacts she got through this job.  Can they elaborate on this an [sic] make her sound not so young – too much school stuff.  Like include a line that she has extensive contacts in media in the Us [sic] and Latin America and ***that is where she might have met the people she introduced us to***.  (emphasis added)

58.     Moreover, virtually all communications at DAP about Pabon and the accounts she purportedly introduced were with Hurtado, including transmission of the Pabon FF agreement,

18

Pabon's wire transfer information for payments, spreadsheets of Pabon's FF payouts with the amount of the kickback to be paid to Gonzalez, and communications about the accounts or with the account holders.

59.     Shortly after receiving the inquiry from DAP's clearing broker, Chinea, Lujan, DeMeneses, Clarke, and Hurtado participated in orchestrating a new iteration of their fraudulent arrangement for trades beginning as of August 2009.  Instead of making the payments through Pabon as a purported FF, these Defendants participated in fraudulently arranging for DAP to conceal its payouts to Hurtado on these trades by hiring Hurtado as a purported DAP "back office" non-registered employee at an annual salary of $1.2 million and for Hurtado to receive a "bonus" that was actually calibrated to make up the difference between Hurtado's salary and the payouts owed to him on BANDES trades that were formerly paid as FF fees to Pabon.  However, as a purportedly ministerial non-registered employee of DAP, Hurtado was not eligible under the applicable rules and regulations to receive this transaction-based compensation.

60.     For example, for the remainder of 2009, Chinea, Lujan, DeMeneses, Clarke, and Hurtado participated in tracking and accruing Hurtado's compensation on BANDES trades on a monthly basis, and then arranged for DAP to pay the total of those accrued amounts, minus the salary that Hurtado had received in 2009, as a purported bonus in February 2010.  In total, pursuant to this arrangement, DAP paid Hurtado approximately $6.1 million for trades from August 2009 through June 2010, nearly all of which related to BANDES trades.  These payments to Hurtado constituted approximately 20 percent of the DAP Global's revenues that were generated by BANDES trades in markups/markdowns during this period.

61.     At the same time, Chinea, Lujan, DeMeneses, Clarke, and Hurtado participated in

modifying their arrangement so that for trades beginning August 2009, Chinea and the DAP

Principals tracked and accrued the kickbacks owed to Gonzalez separately, and then arranged for

DAP to pay those amounts to ETC or Bethancourt for further transmission to Gonzalez as

described herein.  As a result, unlike with respect to the payouts to Pabon, there was no

corresponding portion of the amounts DAP paid to Hurtado that was designated to be remitted to

Gonzalez for trades beginning August 2009, although Hurtado continued his involvement in

monitoring the compensation due to Gonzalez.

### 2.   Sham Arrangements with Bethancourt

62.     To further facilitate making kickback payments to Gonzalez and to receive

additional compensation for themselves, the DAP Global Principals arranged for DAP to enter

into a FF agreement, dated as of May 2009, with ETC, a Panama corporation purportedly owned

by Bethancourt, and subsequently in early 2010 cancelled that agreement and executed a FA

agreement with Bethancourt and registered Bethancourt as a FA of the firm.  The May 2009

agreement, entitled "International Foreign Finder Commission Share Agreement," was signed by

Bethancourt in his capacity as ETC's President and by Lujan on behalf of DAP.

63.     The basic terms of the agreement were essentially identical to DAP's FF

agreement with Pabon.  The 2010 FA agreement, signed by Bethancourt and by Chinea on behalf

of DAP, provides that Bethancourt "desires to introduce [foreign accounts] to DAP" and that

DAP will pay Bethancourt a percentage of the "transaction based brokerage commissions"

received by DAP with respect to referred accounts.  In registering Bethancourt as a FA of DAP

with FINRA, Bethancourt submitted a fingerprint card and other identification information.

64.     However, as with the payments to Pabon and Hurtado, DAP's payments to

Bethancourt and ETC were another sham arrangement contrived by Lujan, DeMeneses, Clarke, and Bethancourt.  Bethancourt had no legitimate role in introducing BANDES to DAP — or even a background in such a business — facts these Defendants took steps to conceal.  Chinea was aware that ETC served as a vehicle for relaying payments to Gonzalez, although Lujan, DeMeneses, Clarke, and Bethancourt concealed their affiliation with ETC and Bethancourt in order to retain additional profits for themselves.

65.     Bethancourt acted largely at the direction of Clarke, his relative.  Nearly all of the compensation that DAP paid to Bethancourt and ETC was deposited into foreign bank accounts of ETC over which Clarke exercised apparent control.  For example, Clarke exchanged numerous emails with another individual ("CL") concerning opening a bank or brokerage account for ETC in which Clarke acted solely on behalf of ETC.  Lujan was copied on several of these emails.  Clarke and CL also emailed concerning ETC's account cash ledgers, portfolio options, executing buy and sell orders, and money transfer authorizations, among other things.  In total, the DAP Global Principals participated in arranging for DAP to pay Bethancourt and ETC a total of at least $20.3 million in connection with BANDES trades.  More than $9 million of the amounts paid to Bethancourt and ETC were subsequently transferred to Castilla Holdings, S.A. ("Castilla"), a Panamanian corporation affiliated with Lujan.

66.     Chinea, Lujan, DeMeneses, and Clarke further participated in arranging for approximately $5.6 million of the amounts to be received by Bethancourt and ETC from DAP to be remitted to Gonzalez.

C.     **Kickbacks to Gonzalez**

67.     The Defendants collectively arranged for at least $9.1 million to be paid as

kickbacks to Gonzalez, the BANDES officer who acted as the primary authorized person for the

BANDES account(s), out of the profits DAP Global generated from markups/markdowns

charged on BANDES trades in connection with their fraudulent scheme.

68.     Many of the kickback payments were directed to Gonzalez through Cartagena

International, Inc. ("Cartagena"), a Panama corporation that is purportedly co-owned by

Gonzalez and another individual who is an apparent relative of Gonzalez ("JG").  On a monthly

basis, Clarke provided to Lujan and DeMeneses a spreadsheet showing payouts owed from DAP

Global's bond and equity trade executions.  The spreadsheet included line item amounts for

ETC/Bethancourt, Pabon, Hurtado, and Gonzalez, using code words.  DeMeneses sent this

spreadsheet on a monthly basis to Chinea for his review and approval.

69.     In addition, Clarke regularly emailed Hurtado spreadsheets that detailed payouts

on trades for which Pabon or Hurtado were to receive compensation (the "Kickback

Spreadsheets").  In the portion of each Kickback Spreadsheet relating to bond trades for

BANDES, there is a column — often labeled "Mary" — that refers to Gonzalez.  In general, the

amount allocated Gonzalez was 20 to 30 percent of the total amount being divided between

Pabon or Hurtado and Mary.

70.     For example, on August 21, 2009, Clarke sent Hurtado two Kickback

Spreadsheets detailing payouts purportedly for Pabon from the markups/markdowns DAP

charged on trades in July and month-to-date in August.  In the portion of each spreadsheet

relating to bond trades for BANDES, in addition to columns for the date of the trade, description

of the bond, quantity, purported purchase price, sale price, and markup, there were also columns

referring to Gonzalez and Pabon.  With respect to July, the column for markups totaled

$2,770,150, the column referring to Gonzalez totaled $546,050 (20 percent), and the column

referring to Pabon totaled $2,224,100 (80 percent).  The July Kickback Spreadsheet also detailed

an additional $12,797.40 in payouts to Pabon for trades in the Other VZ accounts, for a total of

$2,782,947.40, inclusive of the amounts designated for Gonzalez.

71.     The DAP Global Principals and Chinea participated in arranging for DAP to pay

this exact amount — $2,782,947.40 — on August 27, 2009 to Pabon for July trades.   These

defendants each understood that Hurtado and/or Pabon would arrange for $546,050 (the amount

indicated in the Kickback Spreadsheet) to be paid to Gonzalez.

72.     In at least one instance, Hurtado also sent a wire payment to JG directly as a

means to pay to Gonzalez for kickbacks owed on BANDES trades.  A Kickback Spreadsheet

sent from Clarke to Hurtado indicates that "Mary" was owed commissions of $509,250 for May

2009.  In mid-July 2009, Gonzalez sent Hurtado an email message instructing Hurtado to wire

precisely the same amount ($509,250) to an account in JG's name.  Hurtado wired this sum to JG

approximately a week later.

73.     As described above, beginning with respect to trades executed in August 2009,

the Defendants modified their fraudulent arrangement so that all or nearly all of the kickbacks

owed to Gonzalez were instead paid through ETC or Bethancourt.

74.     Accordingly, for the remainder of 2009, Chinea, Lujan, DeMeneses, and Clarke

participated in arranging for DAP to pay ETC the year-end total of the amount still owed to

Gonzalez (approximately $1.9 million) with the understanding that ETC would remit that

amount to Gonzalez.  DAP paid this amount to ETC in addition to ETC's receipt of monthly

payouts totaling approximately $12.3 million through December 2009 (approximately 25 percent

of DAP Global's revenues generated by BANDES trades in markups/markdowns that year) that

were retained by Bethancourt, Clarke, DeMeneses, and Lujan. For the period January through June 2010, the kickback amounts that Clarke and Hurtado participated in tracking and accruing totaled approximately $5.5 million.  Chinea, Lujan, DeMeneses, and Clarke participated in arranging for DAP and/or DAP's parent company, DAG, to pay Bethancourt at least $3.7 million of that amount for the purpose of ETC remitting that amount to Gonzalez.

75.     Clarke personally directed many of the kickbacks paid to Gonzalez via ETC. Specifically, on at least two occasions, CL, an individual with whom Clarke corresponded concerning ETC's bank and/or brokerage accounts, emailed Clarke Word documents containing instructions for ETC's Swiss bank to wire $883,488.30 (April 13, 2010) and $700,000 (April 30, 2010), respectively, to Cartagena's Swiss bank account.  ETC wired those exact amounts to Cartagena on April 19 and May 6, 2010, respectively.

76.     Chinea also participated in orchestrating an arrangement in 2011 to conceal further kickback payments to Gonzalez in which DeMeneses and Clarke paid $1.576 million from their own funds to Gonzalez's shell entity as kickback and DAP then reimbursed them for these payments.  Chinea's active facilitation and creation of this arrangement is reflected in a document titled "Topics of Concerns" that Chinea emailed to DeMeneses on August 1, 2011. The document states, under the heading "Obligations against Firm Capital," that "Mari is asking for her funds.  Estimated to be $554,000.  Tomas is ready to pay when given the go ahead.  Joe has paid in $1,022,000 from his cash."  "Mari" refers to Gonzalez, "Tomas" refers to Clarke, and "Joe" refers to DeMeneses.  Chinea authorized $1.567 million to be transferred to DeMeneses and Clarke from DAP  and, in part, to be falsely booked by DAP as "loans."

77.     On at least one occasion, Clarke and Lujan also arranged for Castilla to be used as an intermediary to transfer funds between ETC and Cartagena for Gonzalez.  On May 24, 2010,

CL emailed to Clarke a Word document containing instructions for ETC's Swiss bank to wire $1,550,000 to Castilla.  That same amount, $1,550,000, was transferred from a Swiss bank account in the name of Castilla to a Swiss bank account in the name of Cartagena on approximately June 4, 2010.

78.     Although Hurtado and Pabon ceased to be personally responsible for paying kickbacks to Gonzalez out of amounts they received from DAP beginning with August 2009 BANDES trades, Hurtado continued to be involved in tracking and monitoring those kickbacks to Gonzalez.  For example, Clarke continued to regularly send Hurtado monthly Kickback Spreadsheets that specified on a trade-by-trade basis the payouts owed to both Hurtado and Gonzalez.  Hurtado then sent similar accountings to Gonzalez.

**D.      Misrepresentations to BANDES Personnel**

79.      Lujan, Clarke, and Hurtado also participated in providing false information to BANDES personnel about the true size of DAP's markups/markdowns and the true counterparties to BANDES trades, taking advantage of the fact that BANDES had no way of independently learning from whom and at what prices at which DAP purchased or sold bonds from the street.  These fraudulent misrepresentations permitted the Defendants to circumvent BANDES' internal trading guidelines and to retain a greater share of the profits for themselves.

80.     The bond prices DAP provided to BANDES included a large markup for DAP. At times, Lujan, Clarke, and Hurtado impersonated representatives of large financial institutions on the telephone and quoted false bond prices to BANDES traders to mislead BANDES about market pricing.

81.     In addition, Lujan, Clarke, and Hurtado knew that BANDES had a policy that

limited its bond trading counterparties to large, well-established financial institutions, and that

DAP was not qualified to be a counterparty.  To disguise DAP's involvement in the transactions,

Clarke and Hurtado, with Lujan's knowledge and approval, falsified the names and logos of the

institutions on trade confirmations faxed to BANDES personnel.

82.     Clarke and Hurtado also falsified to BANDES personnel the prices at which DAP

had acquired (or sold) bonds on the open market to conceal the true size of DAP's markups.

**E.     No Honor Among Thieves: Additional Misrepresentations to Gonzalez**

83.     Lujan, DeMeneses, Clarke, and Hurtado participated in making

misrepresentations regarding bond prices directly to Gonzalez as well.  These defendants had

agreed with and represented to Gonzalez that Gonzalez would receive, and was receiving,

between 50 to 70 percent of DAP's markups/markdowns on BANDES trades.  However, Lujan,

DeMeneses, Clarke, and Hurtado retained a larger share of DAP's markups/markdowns for

themselves by misrepresenting the amount of DAP's markups/markdowns to Gonzalez such that

Gonzalez typically only received less than a 10 percent share.

84.     The real arrangement between DAP Global and Hurtado was that, of the

percentage of DAP's markup/markdown that Hurtado and Gonzalez would collectively receive,

only approximately 20 to 30 percent of that amount was designated as to be paid to Gonzalez in

most instances.  The actual percentage of DAP's markups/markdowns on BANDES trades

collectively paid to Hurtado and Gonzalez was approximately 25 to 30 percent (making the

amount that was designated as to be paid to Gonzalez only approximately 5 to 9 percent of

DAP's total actual markups/markdowns).

85.     Lujan, DeMeneses, Clarke, and Hurtado again used the fact that Gonzalez and

BANDES had no way of independently learning the prices at which DAP purchased or sold bonds from the street to accomplish their deception.  To create the false appearance that Gonzalez was receiving between 50 and 70 percent of DAP's markups/markdowns on BANDES trades, Clarke and Hurtado provided Gonzalez with documents that falsified DAP's street purchase or sale prices and thereby reduced the amount of DAP's markups/markdowns.

86.     That is, in the case of a markup, these documents presented a false, higher price at which DAP purportedly bought the bond from the street together with the correct price at which DAP sold to BANDES, thus netting to a markup on the transaction that was substantially lower than the actual markup DAP charged and falsely appearing to show that the amount due to Gonzalez was 50 to 70 percent of the DAP's total markup.

87.     In furtherance of their scheme, Clarke and Hurtado also documented their misrepresentations in the Kickback Spreadsheets that Clarke emailed to Hurtado.  These spreadsheets often contained separate spreadsheet tabs for Gonzalez and Hurtado (or Pabon) with different street prices and markups/markdowns that are apparent attempts to document their two sets of books — *i.e.*, information to be shared with Gonzalez and information shared amongst Clarke and Hurtado.

88.     The following illustrates the chain of deception from Clarke and Hurtado to Gonzalez:

| | |
|---|---|
| **DAP's Actual Markup** | • Clarke, supervised by Lujan, directs DAP's purchase of bonds from the street to sell to BANDES at a markup<br>• Example: 8/4/09 DAP purchases bonds from street for sale to BANDES at a markup of $875,000 |
| **DAP's Payout to Hurtado** | • Lujan, DeMeneses, and Clarke arrange a total of ~25% of DAP's markup to be paid to Hurtado (either through Pabon as FF or as employee compensation) and Gonzalez (either through Pabon or ETC/Bethancourt), of which ~20-30% is to be paid to Gonzalez<br>• Example: DAP designates payout from markup totaling $250,000 for Hurtado and Gonzalez (~28% of DAP's markup), of which $62,500 (25%) is designated as to be paid to Gonzalez (~7% of DAP's markup) |
| **False Information to Gonzalez** | • DAP's markup is represented to Gonzalez as significantly lower such that payout for Gonzalez appears to be ~50-70% of DAP's markup, even thought it was only <10%<br>• Example: DAP's markup falsely represented as $125,000 of which Gonzalez is to receive $62,500 (50%), even though Gonzalez's share is actually only ~7% |

89.    In fact, the only instances in which the Kickback Spreadsheets present accurate street price and markup/markdown information in the Gonzalez spreadsheet tab is for two large round-trip trades described below — *i.e.*, transactions for which Gonzalez and BANDES would independently know the purchase and sale prices.  Lujan, Demeneses, Clarke, Hurtado, and Gonzalez had arranged for these two blatantly fraudulent round-trip trades in order to generate profits for themselves of more than $10.5 million.  Gonzalez was to actually receive half of these profits because Clarke and Hurtado could not deceive her about DAP's actual markups on these two trades.

**F.    DAP Global Generated More than $66 Million through the BANDES Scheme**

90.    DAP Global's ability to charge inflated markups/markdowns on BANDES trades depended on the payment of kickbacks to BANDES officer Gonzalez in exchange for this order flow of bond trades.  The Defendants and Gonzalez concealed the fact that they intended to, and did, compensate Gonzalez personally in connection with DAP's trade executions for BANDES.

91.     Lujan, DeMeneses, and Clarke participated in generating this fraudulent revenue from markups in "riskless principal" transactions by marking up bonds that BANDES purchased and marking down bonds that BANDES sold.  For example, when BANDES placed orders with DAP to purchase Venezuelan bonds, Clarke and/or DAP Global personnel in Miami or New York accepted BANDES' order; executed a buy order with the market to fill the BANDES order though DAP's riskless principal accounts; and then immediately sold the bonds DAP purchased from the market to BANDES' accounts held at DAP's clearing brokers at a markup.  DAP had no or minimal risk when entering into the transactions, incurred minimal expenses in executing the trades, and performed services primarily limited to inquiring with a handful of large broker desks for bid/ask offers and execution-related activities.

92.     DAP performed the relevant bond trading domestically, in the U.S. over-the-counter markets.  In order to execute trades for BANDES, DAP established Delivery-Versus-Payment/Receive-Versus-Payment (DVP/RVP) accounts for BANDES at DAP's clearing brokers, all U.S. entities.  Gonzalez was an authorized person for these BANDES accounts.  DAP accepted orders from BANDES in DAP's offices in the United States, specifically in Miami, Florida and/or New York, New York.  The counterparty sources in DAP's trades for BANDES were predominantly U.S. broker-dealers or U.S. broker-dealer subsidiaries of foreign entities.  DAP traders arranged the trades with other U.S.-based traders at these broker-dealers via telephone or through electronic communications over a software platform operated by a U.S. company, entered and agreed upon the terms of the trades over the same software platform and executed all trades through DAP's riskless principal accounts at its clearing brokers, all U.S. entities.  The trades also settled, with DAP receiving its markup or markdown on the trades, through DAP's riskless principal accounts at its U.S. clearing brokers.

29

93.     In generating these markups/markdowns, DAP Global personnel, including Lujan, DeMeneses, and Clarke, intentionally misled DAP's clearing brokers, inter-positioned another broker-dealer, and executed two large roundtrip trades that resulted in BANDES paying more than $10.5 million in markups on two trades for no legitimate business purpose.

1.      **Basic Markups**

94.      For many trades, DAP Global personnel simply marked up (or down) the bonds in amounts directed by Clarke and/or Lujan.  In several instances, DAP's markups/markdowns were, without justification, well in excess of 5 percent.

95.     For example, on July 8, 2009, pursuant to a BANDES order for $20.9 million in face value Petroleos de Venezuela, S.A. ("PDVSA") bonds maturing in 2037, DAP Global personnel purchased of the bonds from the street into DAP's riskless principal account at one of its clearing brokers ("Clearing Broker 1") at an average price of 40.08 for a total of $8,667,818, and then immediately sold the bonds out of its riskless principal account to BANDES at an average price of 43.50 for a total of $9,382,068, a markup of $714,250 or approximately 7.6 percent.  Lujan, DeMeneses, and Clarke participated in arranging for DAP to pay Pabon as a purported FF $253,125 for these trades, out of which Pabon was to remit $50,625 to Gonzalez. Lujan, DeMeneses, and Clarke also arranged for DAP to pay ETC approximately $178,500 for these trades.  Chinea authorized the payments to Pabon and ETC.

2.      **Large Round-Trip Trades**

96.     Among the most egregious conduct of the fraudulent scheme, Lujan, DeMeneses, Clarke, Hurtado, and Gonzalez, with Chinea's knowledge and approval, also arranged for two blatantly fraudulent round-trip trades in order to generate profits for themselves of more than $10.5 million.  Specifically, on January 28, 2010, Lujan, DeMeneses, Clarke, and Hurtado

30

arranged with Gonzalez for BANDES to submit simultaneous buy and sell orders for $132 million in face value bonds of Electricidad de Caracas ("ELECAR"), a Venezuelan electricity company.  In these transactions, DAP purchased the bonds from BANDES at 66.00 for a total of $90,673,000, and DAP then immediately sold the same bonds back to BANDES at an average price of 70.00 for a total of $95,953,000, a markup of $5,280,000 or 5.5 percent.

97.     On the following day, January 29, these Defendants arranged a near-identical transaction for $131 million face value ELECAR bonds, in which BANDES sold the bonds to DAP at 66.00 for a total of $90,017,014, and DAP then immediately sold the same bonds back to BANDES at 70.00, for a total of $95,257,014, a markup of $5,240,000 or 5.5 percent.

98.     In total, DAP generated a profit (and BANDES lost) $10,520,000 on these two trade executions that had no legitimate business purpose.

99.     As described further herein, because Gonzalez independently knew the real purchase and sale prices on these fraudulent round-trip trades, Clarke and Hurtado were unable to deceive Gonzalez and retain a greater share of the profits with respect to these trades.

100.     Therefore, Chinea, Lujan, DeMeneses, Clarke, and Hurtado arranged for DAP to pay half of DAP's actual profits on these transactions ($5,260,000) to Gonzalez.  For example, Chinea, Lujan, DeMeneses, and Clarke arranged for at least $3.7 million of that amount to be paid by DAP to Bethancourt with the understanding that those funds would be remitted to Gonzalez.

101.     Apart from Gonzalez's kickbacks, Chinea, Lujan, DeMeneses, and Clarke participated in arranging for DAP to compensate Hurtado (as a purported back-office employee) and Bethancourt (as a purported FA) each approximately $1,052,000 for these round-trip transactions.

3.      **Wash Trades and Inter-positioning to Deceive DAP's Clearing Brokers**

102.    A "wash trade" is a securities transaction which involves no change in the beneficial ownership of the security.

103.    DAP Global personnel executed at least 60 "internal" fictitious wash trades in which, to fill BANDES' order, DAP bought from the street into its riskless principal account at Clearing Broker 1 and sold at a markup to its riskless principal account at another clearing broker ("Clearing Broker 2") only to sell at yet another markup to BANDES.

104.    In at least some instances, Clarke participated in arranging for these "internal" wash trades to conceal from Clearing Broker 1 that DAP was executing trades with BANDES after Clearing Broker 1 had restricted DAP from executing trades for BANDES due to anti-money laundering and compliance concerns.

105.    For example, on July 28, 2009, DAP Global personnel filled BANDES' order by executing a series of same day transactions in which DAP bought a total of $20 million in face value Venezuelan bonds maturing in 2037 from the street into DAP's riskless principal account at Clearing Broker 1 at an average price of 41.09 for a total of $8,547,500.  In order to conceal from Clearing Broker 1 that the ultimate purchaser of these bonds was BANDES, an internal trade was executed in which the bonds were sold from DAP's Clearing Broker 1 account to its Clearing Broker 2 account for a total of $8,953,750, an initial markup of $406,250, and then for the immediate sale of the bonds from the Clearing Broker 2 account to BANDES at an average price of 44.12 for a total of $9,160,000, a further incremental markup of $206,250 for a total markup of $612,500 or approximately 6.7 percent.

106.    Lujan, DeMeneses, and Clarke participated in arranging for DAP to pay Pabon as a purported FF $200,000 for these trades, out of which Pabon was to remit $40,000 to Gonzalez.

Lujan, DeMeneses, and Clarke also arranged for DAP to pay ETC as a FF approximately $153,000 for these trades.

107.     In some instances, DAP Global personnel combined executing "internal" wash trades with inter-positioning another broker-dealer (the "In-Between Broker") between DAP and BANDES.  DAP Global personnel approached the In-Between Broker to inter-position itself between DAP and BANDES by having DAP purchase bonds from the street, sell them to the In-Between Broker at a markup, and have the In-Between Broker sell the bonds to BANDES at a small additional markup that the In-Between Broker retained.

108.     In at least some instances, DAP Global personnel arranged for these inter-positioning trades with the In-Between Broker to conceal from Clearing Broker 1 that DAP was executing trades with BANDES after Clearing Broker 1 had restricted DAP from executing trades for BANDES.

109.     For example, on July 29, 2009, DAP Global personnel filled BANDES' order by executing a series of same day transactions in which DAP Global bought $20 million in face value Venezuela bonds maturing in 2037 into its Clearing Broker 1 riskless principal account at an average price of 41.125 for a total of $8,564,167.  In order to conceal from Clearing Broker 1 that the ultimate purchaser of these bonds was BANDES, DAP Global personnel arranged for an "internal" wash sale for half of the bonds from its Clearing Broker 1 account to its Clearing Broker 2 account before selling to BANDES at an aggregate markup of approximately $155,000.

110.     DAP Global personnel further arranged for the sale of the other half of these bonds ($10 million face value) at an average price of 42.775 to the In-Between Broker for a total of $4,447,083, a markup of approximately $165,000 or approximately 3.7 percent.  The In-Between Broker then immediately sold the bonds to BANDES at an average price of 42.875 (an

additional markup of $10,000 to the In-Between Broker), creating an aggregate markup of approximately 3.9 percent.

111.    With respect to these trades of $20 million face value in bonds, Lujan, DeMeneses, and Clarke participated in arranging for DAP to pay Pabon as a purported FF approximately $112,500 for these trades, out of which Pabon was to remit approximately $22,500 to Gonzalez.  DeMeneses, Lujan, and Clarke also arranged for DAP to pay ETC approximately $80,000 for these trades.   Chinea authorized the payments to Pabon and ETC.

## G.    Using Personal Email Accounts and Destroying Emails To Evade Detection

112.    To conceal their scheme, Defendants Lujan, DeMeneses, Clarke, and Hurtado had a practice of sending email messages relating to BANDES through web-based personal email accounts rather than their DAP-hosted accounts.  DAP's email recording and monitoring software only captured the text of personal emails — not attachments to those emails — and only if they were sent on a DAP computer.

113.    In November 2010, the Commission's Office of Compliance Inspections and Examinations commenced a broker-dealer examination of DAP.  From November 2010 to approximately March 2011, the Commission's examination staff made several visits to DAP's office in New York to conduct the examination and issued document requests for emails of Lujan, DeMeneses, Clarke, and Hurtado, among others.  During the course of the examination, examination staff also asked questions regarding DAP's business with BANDES.  In hopes of concealing their kickback scheme from examination staff, in or around early 2011, Lujan, DeMeneses, Clarke, and Hurtado deleted BANDES-related emails and attachments in their personal accounts and attempted to delete BANDES-related emails from their DAP email accounts.  Defendant Clarke also lied to the examination staff in response to an interview

34

question concerning whether Bethancourt was in fact Clarke's relative.

**H.    The Banfoandes Kickback Scheme**

114.    From October 2008 to at least June 2009, Defendants DeMeneses, Lujan, Clarke, Hurtado, and Pabon also engaged in a fraudulent kickback scheme with respect to Banfoandes, a state-owned Venezuelan bank.  Hurtado introduced the Banfoandes business to Lujan and Clarke just before Lujan and Clarke left their previous firm.

115.    The Banfoandes scheme was similar in structure to the BANDES kickback scheme, though smaller in scale.  Acting in a riskless principal capacity, DAP executed trades in Venezuelan sovereign or state-sponsored bonds and equity securities on Banfoandes' behalf.  A portion of the revenues from these trades was paid to the vice president at Banfoandes who supervised the relevant trading in return for directing the business to DAP.  To route the money, Lujan, DeMeneses, Clarke, and Hurtado arranged to pay a percentage of the fees to PWC, Hurtado's Swiss corporation, as a FF, or to Pabon.  Hurtado then directed a portion of those fees to the Banfoandes vice president, with the knowledge of Lujan, DeMeneses, and Clarke.

116.    As they did with respect to BANDES, Lujan, DeMeneses, Clarke, and Hurtado created or made use of spreadsheets reflecting bond prices and kickback amounts from Banfoandes trades.  For example, a spreadsheet emailed from Clarke to Hurtado in February 2009 contains a list of trades executed in October 2008 and a column indicating the payouts to the Banfoandes vice president, totaling approximately $90,000.

**G.    Summary of Fraudulently Obtained Compensation**

117.    Each of the Defendants received significant compensation resulting from their participation in the fraudulent schemes described herein:

a.      Pabon received (and/or expected to receive) approximately $9.26 million in sham FF fees from DAP for accounts that she did not introduce to DAP and during a time period in which she was not eligible to act as a FF.  Pabon was expected to remit approximately $1.7 million of these amounts to Gonzalez in connection with the fraudulent scheme.

b.      Hurtado received (and/or expected to receive) at least $6.1 million in sham compensation from DAP as a purported "back office" employee that was actually improper transaction-based compensation paid to a non-registered person in violation of applicable regulations.

c.      ETC and Bethancourt received (and/or expected to receive) approximately $20.3 million in sham FF/FA fees from DAP, nearly all of which was deposited into ETC accounts over which Clarke also exercised control.  ETC and Bethancourt were expected to remit at least $5.6 million of these amounts to Gonzalez in connection with the fraudulent scheme.  DeMeneses, Clarke, and Lujan also shared in the remaining amounts in ETC accounts, including by transfers of millions of dollars from ETC to Castilla, an entity affiliated with Lujan.

d.  By virtue of the arrangement with DAP in which the DAP Global Principals were collectively entitled to receive 60 percent of the net profits of DAP Global, the DAP Global Principals were entitled to collectively receive approximately $19 million from DAP for the period January 2009 through June 2010, of which more than $17 million is attributable to markups/markdowns in connection with the

fraudulent BANDES scheme.

e.   Chinea received compensation for the scheme through a substantial increase in his salary in 2009 and 2010, as well as a significant distribution from DAG, DAP's parent company. In 2008, Chinea received total compensation from DAP and DAG of just over $300,000.  In 2009, the year DAP began profiting from the fraud, Chinea received nearly $2 million in salary from DAP and a $875,297 payment from DAG in the first half of 2010 as a bonus or distribution for 2009. In 2010, Chinea also received just over $1 million from DAP in salary.  Chinea's steep increase in compensation was almost entirely attributable to profits from the fraudulent scheme.

## FIRST CAUSE OF ACTION
### Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act
### (Against All Defendants)

118.   Paragraphs 1 through 117 are realleged and incorporated by reference as if fully set forth herein.

119.   Defendants Chinea, Lujan, DeMeneses, Clarke, Hurtado, Pabon, and Bethancourt, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities, (i) knowingly or recklessly, have employed or are employing devices, schemes and artifices to defraud; and/or (ii) knowingly, recklessly, or negligently, have engaged in acts, transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

120.   By reason of the foregoing, Defendants Chinea, Lujan, DeMeneses, Clarke,

Hurtado, Pabon, and Bethancourt, directly or indirectly, singly or in concert, have violated, and

unless enjoined will again violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C.

§§ 77q(a)(1) and 77q(a)(3)].

## SECOND CAUSE OF ACTION

**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c)
Thereunder
(Against All Defendants)**

121.     Paragraphs 1 through 120 are realleged and incorporated by reference as if fully

set forth herein.

122.     Defendants Chinea, Lujan, DeMeneses, Clarke, Hurtado, Pabon, and Bethancourt,

directly or indirectly, singly or in concert, in connection with the purchase or sale of securities,

by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities

of a national securities exchange, have knowingly or recklessly: (i) employed or are employing

devices, schemes, or artifices to defraud; and/or (ii) engaged in acts, transactions, practices, or

courses of business which operated or would operate as a fraud or deceit upon any person.

123.     By reason of the foregoing, Defendants Chinea, Lujan, DeMeneses, Clarke,

Hurtado, Pabon, and Bethancourt, directly or indirectly, singly or in concert, have violated, and

unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and

Rules 10b-5(a) and 10b-5(c) thereunder  [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

## THIRD CAUSE OF ACTION

**Violations of Sections 17(a)(2) of the Securities Act
(Against Lujan, Clarke, and Hurtado)**

124.     Paragraphs 1 through 123 are realleged and incorporated by reference as if fully

set forth herein.

125.    Defendants Lujan, Clarke, and Hurtado, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities, obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

126.    The misrepresentations and omissions as set forth above were material, and Lujan, Clarke, and Hurtado knowingly, recklessly, or negligently disregarded that the misrepresentations were false and misleading.

127.    By reason of the foregoing, Defendants Lujan, Clarke, and Hurtado, directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## FOURTH CAUSE OF ACTION

**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(b) Thereunder
(Against Lujan, Clarke, and Hurtado)**

128.    Paragraphs 1 through 127 are realleged and incorporated by reference as if fully set forth herein.

129.    As alleged herein and set forth above, Lujan, Clarke, and Hurtado, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, have knowingly or recklessly made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

130.    The misrepresentations and omissions as set forth above were material, and

Lujan, Clarke, and Hurtado knowingly or recklessly disregarded that the misrepresentations were false and misleading.

131.    By reason of the foregoing, Defendants Lujan, Clarke, and Hurtado, directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder  [17 C.F.R. § 240.10b-5(b)].

### FIFTH CAUSE OF ACTION

**Aiding and Abetting Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and 10b-5(c) Thereunder (Against All Defendants)**

132.    Paragraphs 1 through 131 are realleged and incorporated by reference as if fully set forth herein.

133.    As alleged herein and as set forth above, each of the Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)] when, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities, they knowingly or recklessly: (i) employed or are employing devices, schemes, or artifices to defraud; and/or (ii) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

134.    By reason of the foregoing, each of Defendants Chinea, Lujan, DeMeneses, Clarke, Hurtado, Pabon, and Bethancourt knew of the violations of each of the other Defendants and each of them knowingly, or with the requisite scienter, provided substantial assistance to each of the other Defendants' violations of Section 10(b) of the Exchange Act and Rules 10b-

5(a) and 10b-5(c) thereunder.

135.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants

Chinea, Lujan, DeMeneses, Clarke, Hurtado, Pabon, and Bethancourt aided and abetted, and

unless enjoined and restrained will continue to aid and abet, violations of Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R.

§§ 240.10b-5(a) and 240.10b-5(c)].

## SIXTH CAUSE OF ACTION

### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b) Thereunder
### (Against Lujan, Clarke, and Hurtado)

136.    Paragraphs 1 through 135 are realleged and incorporated by reference as if fully

set forth herein.

137.    As alleged herein and as set forth above, Defendants Lujan, Clarke, and Hurtado

violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder

[17 C.F.R. § 240.10b-5(b)] when, by the use of means or instrumentalities of interstate

commerce, of the mails, or of the facilities of a national securities exchange, directly or

indirectly, singly or in concert, in connection with the purchase or sale of securities, they

knowingly or recklessly made untrue statements of a material fact or omitted to state a material

fact necessary in order to make the statements made, in the light of the circumstances under

which they were made, not misleading.

138.    By reason of the foregoing, each of Defendants Lujan, Clarke, and Hurtado knew

of the violations of each of the other Defendants and each of them knowingly, or with the

requisite scienter, provided substantial assistance to each of the other Defendants' violations of

Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

139.     Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants

Lujan, Clarke, and Hurtado aided and abetted, and unless enjoined and restrained will continue

to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule

10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### SEVENTH CAUSE OF ACTION
**Aiding and Abetting Violations of Exchange Act Section 15(c)(1)(A) and Rule 10b-3
Thereunder
(Against All Defendants)**

140.     Paragraphs 1 through 139 are realleged and incorporated by reference as if fully

set forth herein.

141.     At all relevant times, DAP was a registered broker dealer pursuant to Section

15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

142.     As alleged herein, DAP, directly or indirectly, by use of the means or

instrumentality of interstate commerce, of the mails, or of any facility of any national securities

exchange, used or employed, in connection with the purchase or sale, or the inducement or

attempted inducement of the purchase or sale, of securities otherwise than on a national

securities exchange, acts, practices, or courses of business that constitute a manipulative,

deceptive, or other fraudulent device or contrivance.

143.     By reason of the foregoing, DAP violated Section 15(c)(1)(A) of the Exchange

Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3].

144.     As further alleged herein, Defendants Chinea, Lujan, DeMeneses, Clarke,

Hurtado, Pabon, and Bethancourt knowingly, or with the requisite scienter, provided substantial

assistance to DAP's violations of Section 15(c)(1)(A) of the Exchange Act and Rule 10b-3

thereunder.  Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants

Lujan, Clarke, Hurtado, Pabon, and Bethancourt aided and abetted, and unless enjoined and

restrained will continue to aid and abet, violations of Section 15(c)(1)(A) of the Exchange Act

[15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3].

**EIGHTH CAUSE OF ACTION**

**Aiding and Abetting Violations of Exchange Act Rule 15b7-1**
**(Against Defendants Chinea, Lujan, DeMeneses, Clarke, and Hurtado)**

145.    Paragraphs 1 through 144 are realleged and incorporated by reference as if fully

set forth herein.

146.    At all relevant times, DAP was a registered broker dealer pursuant to Section

15(b) of the Exchange Act [15 U.S.C. § 78o(b)] and a member of FINRA and NYSE.

147.    As alleged herein, DAP failed to register Defendant Hurtado as an associated

person of DAP, and failed to ensure that Hurtado passed the requisite qualification examinations,

while Hurtado was associated with DAP and effected or was involved in effecting transactions

in, or inducing the purchase or sale of, securities.

148.    By reason of the foregoing, DAP violated Exchange Act Rule 15b7-1 [17 C.F.R.

§ 240.15b7-1].

149.    Defendants Chinea, Lujan, DeMeneses, Clarke, and Hurtado knew that Hurtado

was not registered with FINRA, and that Hurtado had not passed the requisite qualification

examinations, while Hurtado was effecting or involved in effecting transactions in securities for

DAP, and knew that Hurtado needed to be registered with FINRA, and to have passed such

examinations, in order to conduct such activities.

150.    Defendants Chinea, Lujan, DeMeneses, and Clarke failed to cause the registration

of Hurtado with FINRA, and to ensure that Hurtado passed the requisite qualification

43

examinations, even though Defendants Chinea, Lujan, DeMeneses, and Clarke arranged for and

permitted Hurtado to be compensated by DAP for effecting or be involved in effecting

transactions in securities.

151.    Defendants Chinea, Lujan, DeMeneses, Clarke, and Hurtado thus knowingly, or

with the requisite scienter, provided substantial assistance to the violations of Exchange Act Rule

15b7-1 [17 C.F.R. § 240.15b7-1] by DAP.

152.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants

Chinea, Lujan, DeMeneses, Clarke, and Hurtado, aided and abetted, and unless enjoined and

restrained will continue to aid and abet, violations of Exchange Act Rule 15b7-1 [17 C.F.R. §

240.15b7-1].

### NINTH CAUSE OF ACTION

**Aiding and Abetting Violations of Exchange Act Section 17(a) and Rules 17a-4(b)(4) and (j)
(Against Defendants Lujan, DeMeneses, Clarke, and Hurtado)**

153.    Paragraphs 1 through 152 are realleged and incorporated by reference as if fully

set forth herein.

154.    At all relevant times, DAP was a registered broker dealer pursuant to Section

15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

155.    As alleged herein, Lujan, DeMeneses, Clarke, and Hurtado communicated about

their BANDES business using personal email accounts, and later deleted some of these personal

emails.  As a result, DAP failed to preserve originals of all communications received and copies

of all communications sent by the broker-dealer, including inter-office communications, relating

to its business, and during the Commission's examination of DAP, DAP also failed to promptly

furnish upon request by a Commission representative legible, true, complete, and current copies

of all required records.

156.    By reason of the foregoing, DAP violated Exchange Act Section 17(a) [15 U.S.C. § 78q(a)] and Rules 17a-4(b)(4) and (j) thereunder [17 C.F.R. §§ 240.17a-4(b)(4) & (j)].

157.    By virtue of their actions, Defendants Lujan, DeMeneses, Clarke, and Hurtado knowingly, or with the requisite scienter, provided substantial assistance to the violations of Exchange Act Section 17(a) [15 U.S.C. § 78q(a)] and Rules 17a-4(b)(4) and (j) thereunder [17 C.F.R. §§ 240.17a-4(b)(4) & (j)] by DAP.

158.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants Lujan, DeMeneses, Clarke, and Hurtado, aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Exchange Act Section 17(a) [15 U.S.C. § 78q(a)] and Rules 17a-4(b)(4) and (j) thereunder [17 C.F.R. §§ 240.17a-4(b)(4) & (j)].

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that this Court issue a Final Judgment:

### I.

Permanently restraining and enjoining the Defendants, their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from (i) violating Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; (ii) violating and/or aiding and abetting violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and (iii) aiding and abetting violations of Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. § 240.10b-3].

### II.

Permanently restraining and enjoining Defendants Lujan, DeMeneses, Clarke, and Hurtado, their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting violations of Section 17(a) [15 U.S.C. § 78q(a)] and Rules 17a-4(b)(4) and (j) thereunder [17 C.F.R. §§ 240.17a-4(b)(4) & (j)].

### III.

Permanently restraining and enjoining Defendants Chinea, Lujan, DeMeneses, Clarke, and Hurtado, their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting violations of Exchange Act Rule 15b7-1 [17 C.F.R. § 240.15b7-1].

### III.

Ordering each of the Defendants to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### IV.

Ordering each of the Defendants to disgorge, with prejudgment interest thereon, all ill-gotten gains each received directly or indirectly as a result of the misconduct alleged in this Complaint.

### V.

Granting such other and further relief as the Court deems just and appropriate.

Dated: April 14, 2014
        New York, New York

By: _____
    Andrew M. Calamari
    Regional Director
    New York Regional Office
    Securities and Exchange Commission
    3 World Financial Center, Suite 400
    New York, New York 10281-1022
    Tel: (212) 336-0589 (Howard A. Fischer,
    Senior Trial Counsel)
    fischerh@sec.gov

Of Counsel:

    Amelia A. Cottrell
    Wendy B. Tepperman
    Howard A. Fischer
    Amanda L. Straub